(No. 15954.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE OPAL ARTHUR, Plaintiff in Error.

*Opinion filed October 28, 1924—Rehearing denied Dec. 4, 1924.*

1. CRIMINAL LAW—*when it is error to deny change of venue.* Where the defendant makes a strong showing in support of his motion for a change of venue and it is shown that public feeling was so inflamed against him at the time of his arrest that the sheriff deemed it wise to take him to another county, the motion for change of venue should be allowed, and it is error to overrule it.

2. SAME—*instructions as to alibi are improper where no such defense is made.* Instructions on the subject of alibi are improper and may amount to prejudicial error where no defense of alibi is made by the defendant.

3. SAME—*what constitutes a confession—instructions.* A confession is not merely an admission of facts tending to establish guilt but it is an acknowledgment of guilt of the crime charged or of facts which directly and necessarily imply it, and where there is no evidence of a direct confession but only testimony as to certain incriminating statements or admissions by the defendant it is prejudicial error to give instructions on the subject of when a confession is sufficient to convict, especially where the testimony relied upon as showing a confession is that of a convicted criminal serving a term in the penitentiary.

4. SAME—*what statements do not amount to a confession.* Testimony of witnesses that they overheard the defendant, when in jail, say to another prisoner, "I shot him," or "I killed him," or "They say I killed him," is not sufficient evidence of a confession of guilt of murder, where the witnesses further testify that no name was mentioned and that they do not know whether the defendant referred to a person or not.

5. SAME—*when conviction with death penalty will not be affirmed.* Before the Supreme Court will affirm a judgment of conviction of murder with the death penalty fixed, the proof of guilt must be reasonably clear and there must have been no prejudicial error committed during the trial.

WRIT OF ERROR to the Circuit Court of Piatt county; the Hon. GEORGE A. SENTEL, Judge, presiding.

GROVER C. HOFF, A. F. MILLER, and W. F. GRAY, (C. D. BRADLEY, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, BURL A. EDIE, State's Attorney, JAMES L. HICKS, and CHARLES F. MANSFIELD, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error, George Opal Arthur, (hereafter called defendant,) has sued out this writ of error to review a judgment of the circuit court of Piatt county on a conviction for murder and inflicting the death penalty.

Defendant is a single man about thirty years old and lived with his parents on a rented farm about two and a quarter miles south of Monticello, the county seat. He had served overseas with the American expeditionary forces and was discharged in August, 1919, after the close of the World War, and returned to his parents' home. He was employed by J. P. Kratz, owner of a considerable amount of farm land, as choreman at the Kratz homestead, which was about midway between his father's home and Monticello. Charles Martin, the deceased, was about twenty years old, single, and the son of David B. Martin, a stock buyer, who resided in Monticello. Martin and defendant were intimate friends and associates. At the time of his death, and for considerable time prior thereto, Martin was employed as an automobile mechanic at the garage of his brother-in-law, George Rudisill. Defendant's father's family consisted of the father, J. W. Arthur, his wife, two daughters and defendant. December 24, 1921, all the family except defendant went to visit friends some distance away, leaving defendant at the home alone, and did not return until two o'clock in the afternoon of Saturday, December 31. Martin visited defendant at the Arthur home Friday afternoon, December 30. Gibson, a witness for the People, testified he was at the Arthur home at the time and that the relations of defendant and Martin were friendly. The same evening, somewhere in the neighborhood of seven o'clock, defendant drove to Monticello in his Ford runabout, got

Martin and the two drove to the Arthur home. Before leaving town they, or one of them, bought milk and oysters, which they took to the Arthur home, cooked and ate for supper. Defendant claims that after supper, somewhere around nine o'clock, he took Martin in his Ford runabout to Monticello; that Martin said he had agreed to meet some parties there; that when they arrived in front of Russel's barber shop two men were standing on the sidewalk near a Ford car parked at the curb, and Martin said, "There they are now," jumped out of the car and defendant drove home. There is no evidence of Martin having been seen alive by anyone but defendant after he went home with defendant early in the evening. His body was found Thursday, January 5, 1922, in the Sangamon river, at the Croninger bridge, about thirteen miles southwest of Monticello. It was weighted down with a piece of stone in a gunnysack, fastened to the body with wire. The arms and legs were bound up with wire. There were bullet holes in the head and the skull was badly crushed, showing conclusively that Martin had been murdered and his body thrown into the river so weighted and bound that it would not rise again. Sunday afternoon, January 1, Martin's sister, Mrs. Rudisill, called the Arthur home by telephone and inquired if defendant knew anything of the whereabouts of Martin, who had not been seen since Friday evening. Defendant got in his car, drove to the Martin home and talked with Mrs. Martin and her daughter, Mrs. Rudisill. He told them of Martin being at his home Friday evening and of their oyster supper there, and said he then drove Martin to town to meet some parties he said he had an appointment with, and told Mrs. Martin and her daughter about where Martin got out of the car, of two men on the sidewalk, and what Martin said as he saw them and of his getting out of the car. Apparently Mrs. Martin and her daughter suspected defendant of either knowledge of or responsibility for the disappearance of Martin. Mrs. Martin asked de-

fendant if he would mislead one of her children, said she did not trust anyone and would not trust defendant. He denied knowing anything about what became of Martin, and told Mrs. Martin he was sorry she felt as she did. After that visit and conversation defendant returned home. On Tuesday morning, January 3, he returned to his work at the Kratz home in his father's Ford touring car, which he left standing in the garage of a Mr. Stiverson, who lived on the place. That day the sheriff went out to the Kratz place, arrested defendant on a charge of larceny of money from Martin and put him in the county jail. The sheriff testified he looked for blood on the car that day and saw none; that he looked at the running-board, opened the doors and looked at the cushions. The car remained at the Kratz place till the evening of the day following defendant's arrest, when his father went after it and drove it home. The disappearance of Martin excited considerable public interest and several parties visited defendant in the jail and talked with him about Martin's disappearance, some of them directly or indirectly accusing him of Martin's murder. Among the parties visiting defendant in the jail were Martin's mother and sister. To all he denied knowing anything about what became of Martin after he took him to town following the oyster supper Friday night. Searching parties were organized and the body was finally found Thursday, January 5, in the Sangamon river at the place and in the condition above stated. The coroner's jury, at the inquest held January 6, charged defendant with the murder of Martin, and at the February term of court he was indicted for the murder by the grand jury. In May the grand jury was, on motion of the State's attorney, recalled and returned another indictment charging defendant with the same crime. He was tried at the October term, 1922, found guilty and the punishment fixed at death.

A great many errors are assigned as reasons why the judgment should be reversed.

The trial lasted four weeks. With the exception of the testimony of some witnesses who were in jail with defendant, the evidence, the most important of which will be referred to, was circumstantial. The principal circumstances relied upon by the People are, that, so far as the proof discloses, defendant is the last person who saw Martin alive, and that was on the occasion of the oyster supper at defendant's home the night of December 30. On one of the officer's visits to defendant's home in search of evidence he asked Mrs. Arthur for defendant's revolver, and she gave it to him. It required a 32-caliber cartridge, which was the size of the bullet found in Martin's head. The rock (a piece of Bedford stone) placed in the gunnysack and bound by wire to Martin's body was similar to some rock at the Kratz home place, which had been part of a building that had previously burned down, and the wire was similar to wire used on the farm. On January 5, the day the body was found but before the sheriff had notice it was found, he and a deputy, Goodin, went to the Arthur home to again search the premises. While Goodin was searching the haymow and other places, sheriff Gale again examined the Ford touring car of J. W. Arthur, which he had brought home from the Kratz place, where it had been driven by defendant before his arrest and where it had remained two days. The sheriff testified he found blood-stains on the car. They were on the right-hand side of the car, on the rear seat, on the sill between the two seats, on the cushion and upholstering and on the covering of the floor between the front and rear seats. He called Arthur's attention to the stains and inquired whether anything had been recently hauled in the car from which the stains came and was told there had not. Deputy Goodin testified there was "quite a little blood" on the car. Some of the stains were on the matting, some on the upholstering, some on the floor and some "streaks and spots." Late that day, after the body of Martin was found, Goodin and another man went back to the Arthur home and

drove the car to Monticello and put it in the Rudisill garage. It was later, the same day as we understand, taken to the jail garage. Specimens of the stains from the car were delivered to chemists in Chicago, and they testified an analysis of them showed they were human blood. Afterwards several trips were made by officers and others to the Arthur home in search of evidence and May 12 stains resembling blood were found. Some of these were on a barn door at the south end of the barn. Scrapings from these stains were taken for analysis. On the same day scrapings from several stains found at the Arthur residence were taken also. The chemists reported the specimen taken from the barn door was human and beef blood and that the specimens taken from the Arthur residence were not blood. Later more stains were found on the inside and outside of the barn. Specimens of them were taken for analysis. Most of them, according to the chemists, were human and beef blood, some of them were human blood only, some were animal blood, and some were not blood of any kind.

In this connection it is proper to note defendant's claim that if there was blood in the car it was put there after January 3. This contention is based on the proof that when J. W. Arthur and his family left home for a visit on December 24 they were driven in the Ford touring car to the railroad station in Monticello by defendant. There was a comfort in the car and Mrs. Arthur wore a stocking cap to the station, where she took it off and left it in the car. Some of the Arthur family testified these things were in the car when they used it after their return home from their visit. The car was used by Arthur on Saturday afternoon, December 31, when he drove to town, bought about $50 worth of groceries and brought them home in the car. The following day, Sunday, Arthur and his two daughters drove the car to Sunday school, the father riding in the front seat and the daughters in the rear seat. Only one of the daughters returned home with the father, and in the afternoon of

the same day the father drove the car to get the other daughter and bring her home. The following day, Monday, January 2, Arthur and his wife drove the car to a funeral. Arthur testified that on the way to the funeral he drove his car to Rudisill's garage, in Monticello, to get some alcohol put in his radiator, and then went on to the funeral. He testified he did not observe any blood-stains on the car on any of these occasions. He also testified he observed no blood-stains on the barn prior to May 6, when he dehorned a calf. The calf bled freely and he had to put flour on to stop the bleeding. After that there was blood on the barn, inside and outside. He said the stains were sprayed on the barn by the bleeding calf. He further testified that some two years ago, in attempting to take with his fingers some grease out of a pan kept in the cow barn, he ran a piece of granite in his finger at the first joint of the forefinger, and he exhibited a scar which he said it made. He said the finger bled freely, but he went ahead and turned his five cows out of the barn before wrapping the finger. The cows were fastened in stanchions and had to be released. He also testified that in January, 1922, while grinding a butcher knife on a grindstone in the barn, he cut the thumb of his left hand from the nail to the joint, and he showed a scar he said was caused by it. He said when he cut his thumb he reached up above, where some bed springs were, (on which the People's testimony showed the stains of human blood were found,) for a cloth and tore off a piece to wrap his thumb. The blood was dripping freely.

Mrs. Arthur testified to the use of the car on Saturday and Sunday and that the cap and quilt left in it on December 24 were taken out of the car after Sunday, January 1.

Naomi Arthur, sister of defendant, fifteen years old, testified to going in the Ford touring car driven by defendant to the station to take the train when they left home for their visit on December 24, and that when they got out of the car they left a quilt and a cap in the car; that on Sun-

day, January 1, she, her younger sister and her father went to Sunday school in the car and there were no stains on it. She said the quilt was in the car and used as a lap-robe.

Mrs. Tubbs, housekeeper for Mr. Billman, whose house is a little over a half mile southwest of the Arthur home, testified that near eleven o'clock the night of December 30, while she was in bed, she heard what sounded like two pistol shots; that they were about five minutes apart; that the second was louder and more distinct than the first one.

Bonnie Billman testified that some night in December,— she could not fix the time,—she heard what sounded like two pistol shots but could not tell from what direction the sounds came.

Floy Russell testified for the People that she lived with Mr. and Mrs. Stiverson; that the Friday night before New Years she heard, about one o'clock, a car come in the yard; that the engine ran for ten or fifteen minutes and then the car went west, she thought, toward the road, which is not a great way from the house.

These are not all the circumstances proved and relied upon by the State, but are, we believe, the principal and most important ones. In addition to the testimony referred to, the People introduced witnesses to prove statements made to them or in their hearing by defendant.

As soon as the body of Martin was found the sheriff of Piatt county removed defendant to the DeWitt county jail, at Clinton. He was kept there until January 11, when he was removed by the Piatt county officers to the Champaign county jail, at Urbana. January 22 he was taken back to the Piatt county jail, at Monticello.

Ralph Henson, who was a prisoner in the jail at Clinton for "bootlegging," testified he heard defendant say to Lafe Miller, another prisoner, who was awaiting transfer to the penitentiary, "Give me your hand; I believe you are my friend." Miller replied he was, and defendant said, "I shot him." That was all the conversation he heard. He

heard no one's name nor any time mentioned, and said he did not know whether defendant referred to a person or to something else.

Grover Warrick, also a prisoner in the jail at Clinton, testified he had never seen defendant before he was brought to jail; that while in the jail he heard someone ask Lafe Miller, another prisoner, if he was the speaker's friend; that Miller replied he was, and the person speaking then said, "I killed him," or, "They say I killed him." Witness only knew Miller said it was defendant talking to him. He heard no names or time mentioned and did not know whether defendant was referring to a person or not. A dozen or more witnesses who were acquaintances of Henson and Warrick testified their reputations for truth and veracity were bad.

Earl Pitman, who had served a term in the reform school for burglary and larceny and who was at the time of the trial serving a term in the penitentiary for stealing an automobile, testified as a witness for the People, having been brought from the prison as a witness. He testified he was in the Champaign county jail in January, 1922, while defendant was a prisoner there; that defendant began trying to play insane and talked with witness about that as a defense, and witness advised that he adopt some other line of defense; that defendant told him he and Martin had lunch together at defendant's home; that after they had eaten and Martin was putting on his gloves to leave he turned in his chair, which gave defendant the opportunity he was waiting for, and he "throwed a slug." Martin was not killed but rose from his chair, and defendant was so stunned he could not move. Martin staggered outside. Defendant followed him out and found him by the barn, at the entrance to the garage, where he kept his car. Martin was staggering and falling, and defendant said he "throwed another shot into him." He fell at the entrance to the garage. Defendant picked up some pipe lying there and

finished the job. He said he took the body in a car to the bridge and dropped him in the river after first wrapping some wire around the body. Witness asked defendant if he did not know the body would come to the surface in about seven days. Defendant said it would not rise, for he put a rock and half a bale of wire on it. Witness testified that on another day, in his cell, defendant asked him what he knew about Harry Brown, who had been in the Champaign county jail and was then in the penitentiary. Defendant said there was a good chance to "unload the whole thing" on Brown and someone else whose name witness could not remember. Witness further testified defendant said he wiped the blood off the car with a rag, also off a door which Martin had struggled up against when he ran from the house. On cross-examination, when asked if he was still in the penitentiary, he answered, "Yes; and I am going to get out, too." He said the statements he had related were made in defendant's cell and no one else was present. He said a Mr. Firke, a lawyer of Piatt county who had been employed to assist in securing evidence for the People, had visited him at the penitentiary, but he required Firke to prove his identity before he would tell him about the conversation with defendant. Firke, who testified at length in the case, said he visited the penitentiary in search of evidence on May 13, May 25 and September 25. Pitman said he had read about the case in the papers and that they had found blood in defendant's car, before defendant told him the things he testified to.

Joseph Catte, a prisoner brought from the penitentiary as a witness for the People, testified he was in the Champaign county jail at the time defendant was there and heard him say to Pitman that the gun he (defendant) shot him with was not the gun they found, but did not mention the name of any person. He acted irrational, like a crazy man. Witness further testified defendant said he took "him" out of the car, stumbled and threw him off the bridge into the

314—20

creek. At one time he heard defendant say he wiped the blood off the car and thought he had everything clear. There is a good deal of confusion in witness' testimony, and it is difficult to understand under what circumstances, and where, and who, if anyone else, was present when the defendant made the statements witness testified to.

Roy Carrow, deputy sheriff, testified for the People that he and Mrs. Reed had an interview with defendant in the Piatt county jail after he had been brought there from Champaign county. He said defendant stated he had come home from his service in the war with money on his mind, and in reply to questions by witness if that was why he took Martin's money said it was. He said Martin accused him of owing Martin about $115 and said he would send the sheriff to get defendant if he did not pay it, and it was agreed he should pay Martin $100. He said he had paid Martin two payments of $25 each by check and one of $20 in cash. He said Martin saw him four or five times a week and threatened him with the sheriff. Witness testified Mrs. Reed was present when the statements were made. On cross-examination he testified defendant denied having taken money from Martin but said Martin nagged and threatened him till he agreed to pay him $100. Witness said Mrs. Reed did most of the talking to defendant.

Mrs. Reed testified she and Carrow saw defendant in jail and talked with him. She understood defendant had sent for her. He said they were accusing him of the Martin murder. He told witness of him and Martin being together Friday night, December 30, at defendant's home; that previously Martin asked him in town for money he thought defendant owed him, and said he had to have some money to pay debts. Defendant told him they would go to defendant's home and talk it over. They had an oyster supper at defendant's home and talked the money matter over. Defendant did not have wages due him to pay and agreed to try to borrow it. He said Martin said he wanted

to go back to town to meet a couple of fellows who had promised to get some booze. Defendant said he took Martin to town, let him out of the car in front of the Russel barber shop, and he walked over to the sidewalk where two men were standing close to an automobile, and defendant then drove back home. He said that was the last time he had seen Martin. He thought one of the men on the sidewalk was Harry Montgomery. He said Martin claimed $115, but it was agreed if defendant paid him $100 that would settle it. He said he had paid Martin two checks of $25 each and $20 in money. He said he had given him two other checks,—one for $25 and one for $10,— for a carburetor, work on car, inner tubes and spark plugs. Defendant requested witness to come back again alone, and she did so about February 1. Defendant said he had told her the truth as far as he had gone but had not told her all. He said that after he went home, after taking Martin to town, about 10:30 he was awakened, went to the door and found Martin there. He wanted to borrow defendant's father's car, and said he had two fellows with him and their car was not working good; that they wanted to get some booze. Defendant told them he did not want to loan his father's car to transport booze. Martin said there was no danger, and defendant consented to his taking it. He put on some clothes, went out, and Martin introduced him to his two companions. One was named Lynch and one Brown. Martin asked for some old gunnysacks, or sacks that binder twine had been in, and wire to wrap and secure the jugs. He gave them some and they drove away and he returned to bed. About 2:30 in the morning he heard a car drive back, and a little later he went out and looked in the car to see if they had left him something to drink. They had not, but he said his gun, which he had loaned them, was on the back seat. It was clean, was loaded and had not been fired. The next night he started to drive to Cisco and met some parties who indicated they wanted him

to stop. They were Brown and Lynch. He gave them a spark plug and asked where Martin was. They said he was stirring off a batch of booze and would be home in a day or two. Defendant denied he took Martin's money and denied he was in any way connected with his murder.

Sheriff Gale testified that after defendant had been returned to the Piatt county jail he told the sheriff a bunch of booze-runners knocked Martin off and when the right time came he would tell who did it.

M. C. Long, for the People, testified that in a conversation he had with defendant in the jail after defendant told him about bringing Martin to town Friday evening, December 30, and two men standing by a car when Martin got out, witness asked him if he knew them, and he said one of them was a man called "Gummy,"—meaning a man named Montgomery.

Montgomery testified for the People that he was not standing on the sidewalk near a Ford car talking to anyone the night of December 30; that he did not see a car drive up and Martin get out of it, and he did not know defendant. He testified he went to Ellis' place of business, next door to Russel's barber shop, that evening about 8:30 or 9:00 o'clock and stayed till about 10:00 o'clock.

Ellis testified he ran a clothes cleaning and pressing business next door to Russel's barber shop, and that Montgomery came in his place the night of December 30, about 8:30 or 9:00 o'clock, and stayed till after 10:00.

William Smith, State's attorney of DeWitt county, in rebuttal for the People, testified he visited defendant while he was in jail in that county and told him it was known he committed the crime; that he might as well confess, "because they have it on you and you might just as well tell it;" that defendant said, "I am not going to tell it now," or, "I am not going to say anything about it now."

The People introduced proof for the purpose of showing defendant had a motive for killing Martin. Dwight

Duvall, who was employed in Rudisill's garage, testified for the People that Martin did some work on defendant's car September 5, 1921. Defendant was there at the time, and that all the persons in the garage but himself left it for a short time while defendant's car was there. Someone drove up in front and witness went out to see what was wanted. Defendant and Martin had been testing defendant's car and he saw them drive in the door at the rear end of the garage and stop. When witness went in the garage he saw neither Martin nor defendant. He first saw defendant come out of the opening leading to the stairway which went to the upper floor. He heard footsteps on the stairway before he saw defendant. Martin came fifteen or twenty minutes later. His bed-room was on the floor above the garage.

On this same subject of motive, William Biesecker, for the People, testified he bought a Ford car from Martin in August, 1921, and gave him a check for $100. Afterwards, the same day, he saw Martin with $100, all in bills. Defendant was at the garage when Martin came in with the money and saw Martin have it in his hands. The check witness gave Martin was dated August 30, six days before Duvall said he saw defendant come from the opening to the stairway leading to the second floor, where Martin roomed. This proof, and the statements testified to by witnesses that defendant said Martin accused him of taking his money and threatened him with the law if he did not pay it back, we believe is substantially the testimony on the subject of motive.

March 3 and March 14, 1922, after the first indictment against defendant was returned, he filed petitions for a change of venue on account of the prejudice of the inhabitants of Piatt county, supported by affidavits. After the return of the second indictment the motion for change of venue was renewed, and by leave of court the original petition and affidavits were re-filed and defendant given till June 6 to file additional affidavits in support of the petition.

The petitions for a change of venue, and many of the more than fifty affidavits in support of them, set up that the inhabitants of Piatt county were so prejudiced against defendant that he could not have a fair trial in that county. They set out articles printed in newspapers published in Piatt county and neighboring towns in near by counties assuming the guilt of defendant and purporting to give the evidence to establish it. Some of them were bitter and recommended the extreme penalty or predicted that the evidence was so strong against defendant that he would be given the death penalty. Substantially all, if not all, the newspapers condemned defendant as the murderer of Martin, and some of them stated in publications that the officers were in possession of facts which would likely show the murder of Martin was not the first murder defendant had committed. Affidavits of defendant's attorneys stated they had interviewed a number of men who admitted the prejudice against defendant in Piatt county was such they did not believe he could have a fair trial but refused to sign affidavits, some of them stating that the reason for their not doing so was the public sentiment in the county. When the body of Martin was found the officers of Piatt county quickly removed defendant to Clinton, the county seat of DeWitt county, as a protection against violence from the people of Piatt county. A few days later they removed him to the jail at Urbana, Champaign county, and gave as a reason for doing so that the people of Piatt county had learned defendant was in jail at Clinton. About January 22 he was returned to jail in Monticello and has ever since remained there. The People filed an answer to the petition, denying the inhabitants of Piatt county were so prejudiced against defendant that he could not have a fair trial in that county, and supported the answer by approximately 600 affidavits of inhabitants of the county. The court denied the petition for change of venue and defendant was tried in Piatt county, and after venires had issued and 330 jurors

summoned a jury was obtained. The ruling of the court in denying a change of venue is assigned as error.

We shall not discuss in detail the ruling of the court on the motion for a change of venue. The showing in support of it was a strong one. The public feeling was so inflamed against defendant that the sheriff deemed it wise for his safety to remove him from the county for a time. In our opinion the motion for a change of venue should have been granted, and it was error to overrule it.

Defendant entered a plea of not guilty to the indictment and set up the defense of insanity. He did not testify on the trial. On the question of insanity there was some conflict in the testimony, but the testimony for defendant upon that defense was not of such character that in our judgment the jury should have found there was a reasonable doubt of his sanity.

The first and second instructions given on behalf of the People were on the law applicable where the defense is an alibi. Instruction 1 told the jury, before that defense could avail a defendant the proof must cover the whole time of the alleged commission of the crime, so as to render it impossible or highly improbable defendant could have committed the act, and unless the proof in the case showed such an alibi and that the commission of the crime by defendant was impossible or highly improbable, if the evidence showed beyond a reasonable doubt that he was guilty, then that defense was not available to defendant. The second instruction told the jury the burden was on defendant to establish the defense of alibi; that it was incumbent on him to prove facts and circumstances which, considered in connection with all the evidence, create a reasonable doubt of guilt, and if it is not sufficient to do that, the defense cannot avail defendant. No defense of alibi was made by defendant. In *People* v. *Lukoszus,* 242 Ill. 101, it was held to be prejudicial error to instruct the jury on the subject of alibi as a defense when no such defense was made. *People* v. *Smith,*

254 Ill. 167, was a homicide case. Defendant's defense was that deceased was accidentally shot with his own revolver while the two men were engaged in a struggle. The court instructed the jury, for the People, on the law of self-defense. This court held that however correct the instructions may have been as abstract propositions of law, giving them in a case where no such defense was interposed was serious error and tended to lead the minds of the jury away from the real issue being tried. (See, also, *People* v. *Schultz*, 267 Ill. 147.) The trial court stated, in passing on the motion for a new trial, that he did not think the defense of an alibi was made but did not believe the instructions were injurious to defendant.

By the twenty-first instruction given for the People the court told the jury that if a defendant makes a free and voluntary confession that he committed a crime, and the evidence showed beyond a reasonable doubt he was sane, and the confession is believed by the jury to be true, it is sufficient to sustain a conviction without any other corroborating evidence. The twenty-second instruction told the jury that if a defendant who is sane voluntarily and of his own free will confesses to another he committed the crime for which he is tried, and the evidence shows beyond a reasonable doubt that some person committed the crime, the confession is competent evidence, and if the evidence, all considered, including the confession, is sufficient to prove guilt beyond a reasonable doubt the jury should convict the defendant.

In *Michaels* v. *People*, 208 Ill. 603, the indictment was for forgery and the defendant was convicted. The instrument forged was a check for $75 to W. E. Hull, in Peoria, Illinois. Defendant was arrested in Memphis, Tennessee, and taken to a hotel where Hull was stopping. When brought into the presence of Hull and charged with the forgery, witnesses testified defendant told Hull he would give him back his $75; said he would like to fix it up and

would give ten times the amount to settle it. The court instructed the jury that if they believed, beyond a reasonable doubt, defendant had made a free and voluntary confession it would warrant his conviction if the proof showed beyond reasonable doubt that the forgery was committed by someone. The court, after referring to the evidence above mentioned, said it did not amount to a confession, and after pointing out the distinction between an acknowledgment of guilt of the crime charged and declarations or admissions criminating in their nature or tending to prove guilt, said: "By the instruction the jury were advised that a confession by the defendant, if proved, was of itself sufficient to warrant a conviction if the *corpus delicti* were otherwise proved. The jury would naturally assume that the testimony as to what defendant said when arrested was evidence of a confession of the crime with which he was charged, and, with the evidence that the check was forged, was sufficient to justify his conviction. There being no evidence tending to prove a confession it was prejudicial error to give the instruction." The court cited as supporting the decision, *Johnson* v. *People*, 197 Ill. 48.

A confession is limited to an acknowledgment of guilt of the crime or of facts which directly and necessarily imply it. There is a distinction between confessions and admissions of facts tending to establish guilt. *Daniels* v. *State*, 57 Fla. 1; *State* v. *Peterson*, 51 La. Ann. 624; *Fletcher* v. *State*, 90 Ga. 468; *State* v. *Knowles*, 48 Iowa, 598; *State* v. *Red*, 53 id. 69; *State* v. *Reinhardt*, 26 Ore. 466; *People* v. *Strong*, 30 Cal. 157.

Counsel for the People argue that the statements the prisoners in the jails at Clinton and Urbana testified defendant made were confessions. Clearly the statements Warrick and Henson testified defendant made in the jail at Clinton were not an acknowledgment of his guilt of the murder of Martin. One of them testified he heard defendant say to Lafe Miller, another prisoner, "I shot him;" the other that

defendant said to Miller, "I killed him," or, "They say I killed him." Both testified the name of no person was mentioned, and they did not know whether what was said by defendant referred to a person or not. The statements Catte, a prisoner in the Urbana jail, testified defendant made there did not amount to a confession that he murdered Martin. At most they were only statements tending to prove guilt. The only witness who testified to statements of defendant which amounted to an acknowledgment of his guilt of the murder of Martin was Earl Pitman, a prisoner in the Urbana jail when defendant was there and at the time of the trial a prisoner in the penitentiary. We refrain from analyzing his testimony and speaking of the impression it makes upon us. In passing on the motion for a new trial, the trial court, commenting upon Pitman's testimony, said, standing alone it would not convict anybody. But assuming he was a credible witness and his testimony worthy of belief, the giving of instructions 21 and 22 was reversible error.

Counsel for the People argue in their brief that the testimony of all four of said witnesses was of confessions by defendant, and the instructions were evidently given by the court upon that theory. The situation is very similar to that in *Michaels* v. *People, supra.* With equal force it may be said in this case the jury would naturally assume what those four witnesses testified defendant said was an acknowledgment of his guilt of the murder of Martin, and, with the evidence that Martin had been murdered, was sufficient to justify his conviction. Whatever value, if any, the declarations of defendant testified to by Henson, Warrick and Catte may have had as evidence from which an inference might have been drawn, they were not acknowledgments by him of his guilt of the murder of Martin, which was the crime he was tried for. Indeed, so broad and general were the instructions that it was possible for the jury to assume some of the declarations made by de-

fendant to several witnesses for the People in the jail at Monticello were confessions. To all this latter class of witnesses he denied taking any of Martin's money and denied murdering him. No witness testified he acknowledged his guilt of the crime except Pitman, and it was prejudicial error to give the instructions referred to.

There are numerous other errors assigned and discussed in the briefs. Some of them have merit and some of them are without merit, but as the judgment must be reversed for the error in giving the instructions referred to, we will not go into a discussion of them further than to remark that we think there was some basis for the complaint that the court was unnecessarily liberal in permitting leading questions by counsel for the People in examining their witnesses. We express no opinion on the merits of the testimony in the absence of prejudicial error on the trial, but where the extreme penalty for murder is fixed, in addition to the proof of guilt being reasonably clear there must be no prejudicial error committed during the trial if a reviewing court is justified in affirming the judgment.

That Martin was cruelly and brutally murdered seems clear from the evidence, beyond doubt. The crime was of such a character as to excite the righteous indignation of all law-abiding people against the perpetrator. The case is presented to us in voluminous form. The briefs and arguments prepared by defendant contain 283 pages and the abstract 500 pages. The People's brief and argument consist of 342 pages, and they have filed an abstract in two volumes, containing 2300 pages. On account of the importance of the case to both the public and the defendant we have given much time and care to its consideration. It cannot be doubted that the instructions to which we have referred were erroneous, nor can it be reasonably claimed that they were harmless. Defendant never acknowledged his guilt of the murder of Martin unless he did so to Pitman, whose testimony the trial court said would not convict

anybody.   Defendant was contending not only for his liberty but also for his life.   It was necessary that his lawful rights be recognized and that prejudicial errors should not be committed against him.   The errors we have referred to cannot be disregarded, no matter if the evidence could not be reconciled with any theory consistent with defendant's innocence.   He had a right to be tried in accordance with the law and to insist his legal rights should not be violated on the trial.   It is, of course, unfortunate that a judgment, the result of an important and expensive trial, must be reversed and the case again tried, but consideration of such questions can have little influence where human rights are involved and can never justify disregarding such rights.

We have not referred to all the evidence nor to all the errors assigned which have merit, but we have endeavored to state the most important evidence and to discuss the most important errors.   In our judgment the motion for a new trial should have been granted.   Accordingly the judgment is reversed and the case remanded for a new trial.

*Reversed and remanded.*

---

(No. 16153.—Reversed and remanded.)
HARRY ARMS *et al.* Appellants, *vs.* THE CITY OF CHICAGO *et al.* Appellees.

*Opinion filed October 28, 1924—Rehearing denied Dec. 5, 1924.*