(No. 35682.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LARRY ODEN *et al.*, Plaintiffs in Error.

*Opinion filed December 1, 1960.*

EDMUND H. GRANT, of Chicago, for plaintiff in error James Davis; and GERALD W. GETTY, Public Defender, and JOHN M. BRANION, Assistant Public Defender, both of Chicago, for plaintiff in error Larry Oden.

WILLIAM L. GUILD, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and FRANCIS X. RILEY and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

Larry Oden and James Davis were tried jointly in the criminal court of Cook County for the murder of one Roy Carney and the jury returned verdicts finding each defendant guilty and fixing their punishment at death. A writ of error has been issued to review the judgments of conviction. Before proceeding to an analysis of the assignments of error by each defendant, we believe that it is necessary to summarize the evidence at the trial.

Before trial each defendant moved to suppress confessions which they had made. At the hearing on the motion to suppress Davis testified that he was arrested in Louisiana and was brought back to Chicago on the train. On his return from Louisiana he was taken from the train depot to the police station, where his arms were handcuffed to a chair and his feet were handcuffed to a radiator. He testified that a police officer named Irven slapped him, kicked him, and called him names. Irven asked him about the guns that were used in the crime and Davis told him that they were hidden in his back yard. According to Davis the officers then went out to his home where they searched for the weapons without success. They then came back and got Davis and took him out to the house where they made a further fruitless search for the guns. Davis was then taken back to the station where he was slapped and beaten by the police and subjected to other abuses. He testified that he heard Irven call Mrs. Carney, the widow of the deceased, and tell her that they had picked up Davis in Louisiana. He testified that Irven also told Mrs. Carney how Davis was

dressed so that she would be sure to identify him. Davis testified that he confessed as a result of the beatings and because he knew that Mrs. Carney would identify him. He was then questioned by an assistant State's Attorney and the questions and answers were taken down in shorthand and typed. When the typed statement was submitted to Davis, he refused to sign it and claimed that it was not true. Officer Irven denied that he had abused Davis in any manner and three other police officers who had been present while Davis was being questioned testified that at no time was any force or threats used against Davis. The trial judge then denied Davis's motion to suppress.

In support of his motion to suppress, Oden testified that on the night of the crime, he had borrowed Davis's car and that he and two men, referred to only as Jimmy and Danny, were in the car looking for some girls. They stopped at a tavern known as the Marquette Lounge and Oden and Jimmy went in to get some cigarettes. They were informed that the tavern did not sell cigarettes and returned to the car. Danny then borrowed Oden's coat and Danny and Jimmy went back into the tavern, leaving Oden in the car. Oden heard a shot from the tavern and Danny and Jimmy ran out of the tavern and drove off with Oden. They drove to Davis's house and Jimmy told Oden that he and Danny had shot a man in the tavern and that if the police questioned Oden, he should tell them that Davis was driving the car at the time. Jimmy threatened to kill Oden's girl friend and Davis's children if Oden did not tell this story to the police. Oden was arrested four days later and signed a confession an hour or so after his arrest. He testified that the police never threatened or abused him and testified that he signed the confession because of Jimmy's threats. The trial judge denied Oden's motion to suppress.

After the hearings on the motions to suppress the case proceeded to trial before the jury. Leola Woods testified that on the night of the crime she was employed as a bar

maid in a tavern known as the Marquette Lounge. At about 9:45 in the evening the defendant Oden came in to the tavern and asked for some cigarettes. Mrs. Woods told him that they did not sell cigarettes and he left the tavern. About ten or fifteen minutes later Oden and Davis came into the tavern and Oden walked to the washroom and told Davis to order him a beer. Davis sat at the bar and ordered two bottles of beer. Oden then returned from the washrom and sat down at the bar for a few moments and then left his seat at the bar and walked down to the end of the bar where Mrs. Woods was standing and pointed a gun at her and told her that this was a holdup. Davis then left his seat at the bar, drew a gun and told everybody to go to the back of the tavern. Roy Carney at this time was standing near the end of the bar with his wife, and Oden told Carney to turn around and put his hands on the refrigerator. Carney complied with this request and Oden searched Carney. Davis was engaged in getting the rest of the customers to go to the rear of the tavern. One of the customers who was sitting in a booth with his wife was slow in responding to Davis's demand and Davis hit him on the head with his pistol. After Carney had been searched he went into the back room and Oden followed him. Davis then told Mrs. Woods to open the cash register and as she was opening the register she heard a scuffle and a shot from the back room and heard Oden call out. When Oden called, Davis went to the back room and just as he stepped through the doorway Mrs. Woods heard three more shots. She jumped over the bar and ran out the door, where she saw a watchman and told him that there had been a holdup. The watchman took out his pistol just as Oden and Davis were running out of the door and shouted to them to halt and fired in the air. They said something to the watchman and ran toward a car. About a week later Mrs. Woods went to the police station and identified Oden out of a lineup of six or seven men. When she identified him Oden said to

the police, "That is the bar maid that served the beer." She identified both Oden and Davis at the trial.

Carol Carney, the widow of Roy Carney, testified that she saw Oden when he confronted Mrs. Woods with a gun in his hand and told her that it was a holdup. She then looked around and saw Davis across the room. She testified that Oden searched her husband before sending him into the back room and that after he was searched he went in to the back room as he had been ordered. She heard Davis tell Mrs. Woods to open the cash register and testified that at this time she heard a shot from the back room where her husband and Oden had gone and heard Oden yell for help. Davis then went to the back room and as he got to the door he fired several shots. Oden and Davis then ran out of the tavern. Mrs. Carney went to the back room and found her husband lying unconscious on the floor. On cross-examination she testified that she remembered seeing Oden come in for cigarettes but thought nothing of it at the time. However, after the attempted robbery and the murder she realized that Oden had come into the tavern a few minutes earlier for the cigarettes. She likewise identified Oden at the police lineup and identified both Oden and Davis at the trial.

Edward Stansell testified that on the night of the crime he was in the Marquette Lounge and saw two men come in and ask for cigarettes. A few minutes later they returned and announced a holdup. He saw one of the men slap one of the customers on the head and saw another man take Carney back in the kitchen. He heard a gun go off two or three times and heard the man in the back room call for his partner. He saw the other man walk to the back room and heard two shots fired. On cross-examination he testified that he had told the police that he could recognize both men by face, stature, and complexion, and testified that at the time of the trial he was sure that Davis was one of the robbers. He testified further on cross-examination that he

was not able to positively identify Oden except by stature and build. At the police lineup he did not positively identify Oden but stated that he was about the size and color of the robber. He was not at that time able to say definitely that Oden was the man and was not at the time of the trial able to positively identify him. He testified that at the lineup the police asked Oden if he recognized Stansell and Oden replied that he did not recognize him, but he did recognize Mrs. Woods as the bar maid that served him the beer.

Peter Latsis testified that he was a customer in the tavern at the time of the crime and that he was in the back room when Carney was shot. When he walked in the room Carney was lying on the floor on his back and Latsis, in response to a demand by the gunman, laid down beside Carney. The gunman then said to Carney, "You have something on you." A struggle ensued and a gun went off. The gunman yelled for help and the other man came into the back room and fired two shots. Latsis was not able to identify either of the men.

Les Reed testified that he was also a customer in the tavern. He was sitting in a booth with his wife, and one of the gunmen, whom he identified as Davis, hit him on the head with his gun and told him to stand up and go to the back of the tavern. He heard some shots from the back room and saw Davis go to the back room and saw him shoot into the back room from the doorway. This witness was not able to identify Oden either at the lineup or at the trial.

Jay Anderson testified that he was a watchman and that as he was making his rounds Mrs. Woods came out of the tavern and told him there was a holdup. He went across the street and then saw two men run out of the tavern. He identified them only as a tall man and a shorter man. Anderson shouted to these men and demanded that they halt. One of the men kept running but the other man turned around and pointed a gun at Anderson and told him to stay

where he was. Anderson then fired two warning shots and the second man then ran after the first man. Anderson ran down the opposite side of the street and saw the men get into a Cadillac automobile. He identified a picture of an automobile as "looking like" the car that the men drove away in. He was unable to identify either of the men.

Bryan Connolly testified that he was a police officer and that he had been assigned to the investigation of Carney's murder. In the course of his investigation he talked to several people and as a result of these conversations he went to Oden's apartment and placed him under arrest. At that time Oden told Connolly that there were some guns in the bedroom closet and Connolly's partner went in the closet and got three guns. As they were leaving the apartment Oden said "I will tell you the story. I took part in the attempted robbery and murder of Roy Carney, Jr." Connolly then went to Davis's apartment and searched the apartment and went out to the rear yard where he found a Cadillac car which he took into custody. A picture was taken of this automobile, which picture was identified by Anderson at the trial as "looking like" the get-away car.

Connolly testified that after Davis was apprehended, Davis told him that he would tell him where the guns were that were used in the shooting. Connolly told Davis that he thought they already had the guns but Davis told him that the guns that were used in the murder were buried at the rear of Davis's home. Connolly and another officer went to the Davis home and dug up the yard looking for the weapons but did not find them. Subsequently, he had a talk with Davis's father-in-law and after this conversation he went back to Davis's apartment and the father-in-law pointed out the guns which were then lying in the bottom of one of the holes that the officers had dug in the yard. They then brought Davis out to his apartment and he admitted burying the guns after the murder and stated that he had also buried a bag containing the expended

cartridges. A further search was made and this bag containing the cartridges was found.

The confessions were then admitted in evidence. In Davis's confession he said that he and Oden both went into the tavern and asked for cigarettes. When they were advised that the tavern did not sell cigarettes they went back to the car to plan the robbery. They went back in and Davis told Oden that he didn't think the place was "right" and that he thought the "big guy" was a policeman. However, they decided to go ahead with the robbery and both of them drew their guns and announced that they were holding up the place. Davis was engaged in ushering the customers to the rear of the tavern when he heard two shots from the rear. He became excited and ran to the back room where he saw two figures struggling on the floor. He fired twice and saw the officer (Carney) attempt to rise. Davis then fled and as he was leaving he heard another shot. Oden followed Davis out of the tavern and as they ran out the door they saw the watchman, who fired one shot at them. They got in the car and drove down the street. They were driving the wrong way on a one-way street and were stopped by a policeman who let them go after Davis gave him five dollars. They then went to Davis's home and Davis buried the guns in the back yard. The confession contained other details of the events of the night of the crime, but it is not necessary to relate them here.

In Oden's confession, he related that he and a man referred to only as Slim went into the tavern to get cigarettes, and returned to the car to plan the robbery. He stated that both he and Slim pulled their guns and announced that they were holding up the place. The confession stated that Oden took Carney and another man into the back room and made them lie down. He saw Carney reach for a gun and he and Carney struggled on the floor. Oden's gun discharged and Oden yelled for help. Slim came back and

shot two or three times. Oden and Slim then ran out of the tavern, were confronted by the watchman, and escaped in the car. They were stopped by a policeman for going the wrong way on a one-way street, but were permitted to proceed.

The guns which had been found in Davis's yard were admitted in evidence and the court told the jury that they were admitted only as to Davis. The only other evidence for the State was a stipulation as to the findings of the coroner's physician, which showed that Carney died as a result of a bullet wound to the brain and also showed that Carney was shot in the chest.

For the defense Oden testified that he had borrowed Davis's car and he and a man named Jimmy Rogers and another man named Danny took the car to go see some girls. He testified that while they were looking for the girls he and Jimmy went into the Marquette Lounge to get some cigarettes. When they were informed that the tavern did not sell cigarettes they returned to the car and Danny borrowed Oden's coat and Danny and Jimmy went into the tavern leaving Oden in the car. He testified that he did not know that Danny and Jimmy were going to hold the place up. He heard a shot from the tavern and a few minutes later Jimmy and Danny ran out of the tavern and back to the car. They drove back to Davis's apartment where they left the car, and at this time Jimmy made the threat that he would kill Oden's girl if Oden did not tell the police that Davis committed the crime. He testified that his confession was not true and that the reason he made it was that he had been threatened by Jimmy. He testified that the part of his confession where he admitted going into to the tavern for cigarettes was true but he denied that he ever went back in the tavern and denied taking any part in the holdup and shooting.

Davis testified that on the night of the crime he was home with his wife playing cards. He testified that he

loaned his car to Oden earlier in the evening and that he didn't see Oden again until about 11:30 or 12:00 that night when Oden returned the car and told Davis that there was a man downstairs that wanted to see him. He went downstairs and talked to this man who told him that they had some trouble and that Davis had better get out of town because the police would be looking for him. This man threatened that if he didn't get out of town he would kill Davis's children. The man gave Davis some guns but Davis said that he didn't want them and suggested that the man bury the guns. The man then went out in the yard and buried them. He testified that he then left town and went first to his brother's home in Mississippi. He testified that after his return following his arrest he was abused by the police officers, as a result of which he confessed his guilt of the crime. He testified that his confession was not true.

In rebuttal the police officers whom Davis had accused of mistreating him all testified that Davis was not abused in any way. Another police officer, James Brooks, testified that on the night of the crime he stopped a black Cadillac car a short distance from the tavern where the shooting had occurred and warned the driver about going the wrong way on a one-way street. He testified that Davis was in the car at the time.

We turn now to a consideration of the assignments of error. The most serious of these contentions is that the defendants were prejudiced by the introduction of proof of unrelated crimes. This evidence was contained in the defendants' statements which were admitted in evidence. In Davis's statement he was asked to relate in his own words what had occurred. Davis related at some length the details of the crime and at the end of his anwer, he said, "We finally arrived at my house at 1248 South Troy where I pulled the car into the driveway, backed into the rear where we had counted the money that we had secured from other

robberies." A few questions later, the following questions were asked and Davis made the following replies:

"Q. Did any one perpetrate any of the other robberies with you?

A. When you say other * * *

Q. This evening. You say that you split up the money.

A. Yes.

Q. Was there just Larry and you who were doing the robbing?

A. That's right."

In Oden's statement, he was asked where he had obtained the gun that was used and he replied, "It was a gun in one of the stickups. I don't know what joint it came from exactly." Counsel for Oden and Davis did not object to these references to other crimes and did not demand that they be deleted from the statements before they were read to the jury. Normally, failure to object would preclude defendants from raising the question on this writ of error. However, present counsel for Davis alleges that Davis's appointed trial counsel was incompetent, and we are of the opinion that in the interests of justice we must consider the contention that the introduction of this evidence was improper.

It is, of course, well settled that evidence of other offenses which are unrelated to the crime for which a defendant is on trial is incompetent, and where such irrevelant material is contained in an otherwise competent statement on confession, it must be deleted before the confession is presented to the jury, unless to do so would severely impair the evidentiary value of the confession. (*People* v. *Donaldson,* 8 Ill.2d 510.) The *Donaldson case* also held that it is improper for the prosecution to comment upon facts or evidence which are inadmissible. In the *Donaldson case* the defendant's written, unsigned confession referred to other holdups and also disclosed that the defendant, a mar-

ried man, was living in adultery with another woman. In final argument, the prosecutor stated that evidently robbery was the defendant's profession. We held that this evidence and argument could have prejudiced the jury against defendant to the extent that the jury imposed the death penalty and therefore reversed and remanded the cause for a new trial. In the present case, Davis's written unsigned statement contains references to other holdups. This information was first volunteered by the defendant, but it was followed by an inquiry by the assistant State's Attorney as to who was involved in the other robberies. In the prosecutor's argument in the present case, he stated that Davis had a chance and opportunity to develop himself but he had thrown it all away on a career of crime. The prosecutor, in arguing for a severe penalty, stated that a long sentence might be some deterrent to those engaged in robbery gangs and stated that what the jury did would be watched by a lot of people engaged in the same line as Oden and Davis. The striking similarity between the evidence and argument in *Donaldson* and that in the present case is immediately apparent. In both cases, the statement contained references to other crimes; in *Donaldson* the prosecution stated that evidently robbery was the defendant's profession and here the prosecutor referred to Davis's "career" of crime and referred to other robbers as being in the same "line" as Oden and Davis.

The State argues that the references to other crimes in the statements were incidental and were included by oversight and carelessness, and not in a deliberate attempt to prejudice the jury. The first reference to other crimes in Davis's statement and the reference in Oden's statement might be considered in this category, for both were volunteered by the defendants. The inclusion of these matters in the statements might be chargeable to carelessness, but there is no explanation of why they were not deleted from the statements before they were presented to the jury. The situ-

ation here is entirely different from the case where such testimony is inadvertently elicited during the heat of a trial. Here, the statements had been taken almost six months before the trial and had remained in the custody of the prosecutor. When they were offered in evidence at the trial, the prosecutor knew that the prejudicial references to other crimes were contained in the statements, yet he made no move to have these matters deleted from them, although they could have been deleted without damaging the efficacy of the statements. It is no answer to say that defendant's appointed counsel did not object, for Davis claims that his appointed counsel was incompetent, and in such cases we will consider the errors assigned, even though not objection was made at the trial. (*People* v. *Stokes,* 18 Ill.2d 371.) Also, it is the rule that the State's attorney in his official capacity is the representative of all the people, including the defendant, and it is as much his duty to safeguard the constitutional rights of the defendant as those of any other citizen. (*People* v. *Sweetin,* 325 Ill. 245; *People* v. *Cochran,* 313 Ill. 508.) The failure of the prosecutor in the present case to see that the prejudicial matter was deleted from the statements was a violation of that duty.

The prejudicial effect of the references to other crimes was compounded by the prosecutor's argument. The State admits that the use of the word "career" by the prosecutor was unfortunate but contends that this argument did not mean to imply that Davis had actually made a career of robbery, but was only intended to reply to the argument of defendant's counsel that Davis had a fine record in the Army. However, the proceedings in the trial court on the hearing of the defendant's motion for a new trial leave no doubt that the prosecutor intended to imply that defendants had had prior experience in robberies. In the course of that hearing the following appears:

"This about 'career' in crime. That Mr. Lee made some statements as to how eloquent the defendant Davis

was on the witness stand. And of course he was very well spoken, does speak very well. Also he had brought out the army experience of the defendant and the fact that he was chief induction officer for the State of Michigan, so on, and it was a contrast. I want to answer that and point out the fact that the defendant was engaged in a career of crime and killing. I think the State would have a right to make an inference from the facts of this robbery, the efficient way it was conducted, and so on, the inference that the defendants had, or the defendant Davis, or Oden, either one, had some prior experience in this line.

The Court: Is there any evidence in the record of a 'career of crime'?

Mr. Lund: No, it would have to be a matter of inference from the total evidence. Of course, there is no evidence in the record as to any career of crime, Judge, but I was contrasting his career in the army with his present career, that was his career in the tavern.

The Court: His career in the army was six years.

Mr. Lund: Yes.

The Court: His career in this robbery was fifteen minutes, wasn't it?

Mr. Lund: That is true. And also, I think that Davis's statement, when he was telling about the planning of the crime and so on, the fact that he sized up the situation at this particular tavern as being a little dangerous, and that he thought that the big fellow in there was a police officer, I think that we could infer from that evidence that the experience, as far as Davis is concerned, and the occupation of robbery, was not that of an amateur."

It is clear from this statement by the prosecutor that when he referred to Davis's "career" of crime he meant to imply that the defendants had had prior experience as robbers, and he contended that he had the right to make that inference and call it to the attention of the jury. The argument was a deliberate attempt to bring before the jury the fact

that the defendants had committed other crimes and, when considered in connection with the evidence of such other crimes in the statements, was prejudicial to the defendants.

This contention was carefully considered by the trial judge when the motions for a new trial were argued. He agreed that the references to other crimes should have been deleted and agreed that the reference to the causes of crime was unfortunate, but was of the opinion that this evidence and argument did not influence the jury in fixing the death penalty. In the *Donaldson case* we said (8 Ill.2d 510 at page 519) : "It must be remembered that the jury in the present case not only determined the question of guilt but also passed upon the turpitude of the crime by fixing the punishment itself. Although it is impossible to determine the exact effect that such improper material may have had upon the minds of the jurors, inferences of immorality and prior criminal behavior could quite reasonably be expected to arouse a certain degree of animosity, and in this case, such inferences may have resulted in the refusal of leniency and infliction of the extreme penalty of death. Every defendant, be he a sinner or a saint, has the right to expect that his fate will be fixed with reference only to the circumstances of the crime with which he is charged." This reasoning is sound and persuasive. If there is a possibility that admittedly erroneous evidence and argument could influence the jury in fixing the penalty, it becomes a matter of pure speculation as to whether the jury was in fact influenced. Where the lives of the defendants are at stake, speculation should play no part in our decision, and while in certain matters the decision of the trial judge is entitled to great weight, his opinion as to whether the jury was influenced is likewise a matter of pure speculation and is not controlling. For the reasons expressed herein, we are of the opinion that the defendants did not receive the fair and impartial trial to which they were entitled. While the errors as to the defendant Davis were the most serious, we

are of the opinion that the defendant Oden necessarily was prejudiced by the conduct referred to herein, for he was named in Davis's statement as the party with whom Davis had committed other robberies and he and Davis were referred to jointly in the prosecutor's argument as being in the same "line," referring to robbery gangs. While the jury was advised that Davis's statement was admissible only against Davis, we cannot say that the prejudicial effect of the statement did not operate as to Oden as well.

We have based our decision largely upon the *Donaldson case*, since the facts there were so similar to those in this case. In addition to *Donaldson*, our holding here finds support in many other cases in which a jury verdict fixing the death penalty has been reversed because of prejudicial error, in spite of clear evidence of guilt. *People* v. *Dukes*, 12 Ill.2d 334; *People* v. *Crump*, 5 Ill.2d 251; *People* v. *Winchester*, 352 Ill. 237.

Since we are of the opinion that the errors discussed herein require that the defendants be granted a new trial, we find it unnecessary to consider the other errors assigned, many of which are of such a nature that they will likely not occur on a new trial.

The judgments of the criminal court are reversed and the cause is remanded to said court for a new trial.

*Reversed and remanded.*