**People of the State of Illinois, Plaintiff-Appellee, v. Alfred Hexum and James Stovall, Defendants, James Stovall, Defendant-Appellant.**

Gen. No. 10,814.

Fourth District.

May 19, 1967.

Richard C. McDonald, of Decatur, for appellant.

Basil G. Greanias, State's Attorney of Macon County, of Decatur (Frederick P. Erickson, Assistant State's Attorney, of counsel), for appellee.

SMITH, J.

Defendant James Stovall and one Alfred Hexum were jointly indicted for a murder committed during the early morning robbery of Bolch's Service Station. Motion for a severance was allowed. Hexum pleaded guilty, was sentenced to 20 to 50 years and thereafter testified for the State during the jury trial of Stovall. Upon the guilty verdict of the jury, Stovall was sentenced by the court to 30 to 60 years in the penitentiary. He appeals.

Defendant asserts he did not receive a fair trial because the prosecutor deliberately injected into the record evidence of other crimes in an effort to paint the defendant as a professional criminal; that one instruction of the State was erroneously given; that an instruction offered by the defense was erroneously refused, and that the evidence does not establish guilt beyond a reasonable doubt.

Before reviewing the incidents relied on by the defendant, we should point out that it was the theory of the State in the trial court and now in this court that the activities of Hexum, Wood, and Stovall during the two or three hours immediately preceding the murder are admissible to establish a common plan, design, purpose, or conspiracy to engage in criminal activities which snowballed into the robbery of the Bolch Service Sta-

tion and the death of its attendant, Russell Crist. We should also point out that Wood dropped out of the enterprise before the Bolch robbery and Hexum and Stovall continued on alone in Stovall's car. In his opening statement, the State's Attorney stated that evidence would show that the three men entered Stovall's car shortly after midnight and drove to Lovington, Illinois. On the way they discussed and "were going to rob or burglarize a building in Lovington. . . ." Objection sustained. Jury instructed to disregard. Arguments outside the presence of the jury—jury returned. Objection again sustained. Motion by defendant to withdraw a juror and declare a mistrial denied. In his opening statement, defendant stated that the defense would·show that Hexum and Stovall were driving together that night "just like a couple of boys riding around" and that "I believe the evidence will further show that there was no common design; that there was no conversation; no plan on the part of Mr. Stovall for any robbery of that service station, and of no murder of Russell Crist."

██ Evidence which tends to show that an accused has committed crimes or acts of misconduct which are distinct and unrelated to the one for which he is being tried is both incompetent and prejudicial. People v. Donaldson, 8 Ill2d 510, 134 NE2d 776; People v. Gregory, 22 Ill2d 601, 177 NE2d 120; People v. Oden, 20 Ill2d 470, 170 NE2d 582. In recognizing this rule in People v. Brown, 26 Ill2d 308, 315, 186 NE2d 321, our Supreme Court also takes note that there are well known exceptions to the rule and among them is "that such evidence may be admissible to prove design, motive, or knowledge when those matters are in issue or relevant." In Brown, as here, the court was dealing with a murder climaxing an attempted robbery. Brown's statement introduced into evidence contained an admission that he and his companions had participated in another burglary six days earlier. There, as here, the defendant took the position

that there was no common design, scheme or conspiracy to commit robbery. The court there states on page 316: "we are of the opinion the disputed evidence was admissible under the exception which permits evidence of acts showing a common scheme or purpose." We turn now to the evidence to which this rule applies.

A witness, Wood, testified for the State that he and Hexum had lived together in the same boarding house in Decatur for about a month; that he had gotten off work at midnight and returned directly to his boarding house and shortly thereafter Hexum and Stovall appeared. He identified Stovall in the courtroom. Question: "How long have you known Mr. Stovall?" Answer: "Since right after he got out of prison." Objection. Objection sustained and jury instructed to disregard that remark. He then stated that he, Hexum and Stovall drove to Lovington, Illinois, in Stovall's Chevrolet car. Asked whether there was any conversation about the Bolch Service Station, he said, "Yes, Hexum wanted to 'hit it.'" Stovall said, "No, he hit it once before and it wasn't worth the effort, couldn't get enough money." Wood then identified a 22-caliber bolt action J. C. Higgins rifle and stated that he first saw it on that evening in the back seat of Stovall's car. On the way to Lovington, Wood loaded the rifle with ammunition supplied by Hexum. On their return to the boarding house, Hexum and Stovall talked about hitting another place and Stovall asked the witness to hide the rifle. Stovall and Hexum then left. Wood then went outside to get the rifle which had been placed in a Buick automobile which he was buying from Stovall. The rifle was gone. On the next day Wood was dancing with his girl friend, Donna Galligar, when Stovall arrived. He asked Stovall what was going on and whether anything had happened at the Bolch Service Station. Stovall said he didn't know what he was talking about. They then discussed leaving Illinois and did depart about 2:30 that afternoon for Wichita,

195

Kansas. In Wichita, Wood-stated he was going to come back to Decatur and turn himself in. Miss Galligar also wanted to return—Stovall said that he wanted to come back and contact a lawyer—that he wanted to talk to a lawyer first and then turn himself in. On the way back, the three of them came upon a string of cars and among them was a police car. When the driver of that car saw the Stovall car, he turned around and Wood, who was then driving, pulled off the highway thinking it was a country road, but it turned out to be a farmer's lane and dead-ended at the farmer's house. Wood testified that they were then attempting to elude the police officer's automobile. When they came to the end of the lane, Stovall got out of the car, took two guns and ran and an hour or two later, Wood again saw Stovall in the jail in Jefferson City, Missouri. Between Wichita and Jefferson City, the witness noticed several coins wrapped up in white paper laying back in the glove compartment. He asked Stovall about the coins and Stovall said they were coins stolen at the Bolch Service Station. Wood also testified that in the morning before leaving Decatur he had taken the rifle out to an old abandoned car near Decatur and put it in the rear end of the car. He later told the police where it was and the rifle was then reclaimed. In rebuttal, Wood also testified that some six, eight or ten times during the trip to Wichita, Stovall told him and Miss Galligar that he and Hexum were riding around and they stopped at the Bolch Service Station to fix his lights as he was having trouble with them; that Hexum got out of the car and when Hexum came back, he told Stovall to get out of there because he (Hexum) just robbed the place and as they were leaving, Hexum told Stovall he shot that man.

Hexum testified for the State that after returning from Lovington they were proceeding to move the weapons from the car. Question: "What weapons are you referring to?" Answer: "The weapons we stole at. . . ."

196

Interruption. Objection. The State's Attorney: "Just a minute, I want to caution you." The matter was dropped. The witness talked Stovall out of a revolver and witness was trying to dismantle it. Stovall came into the house and demanded the revolver from him and said he wanted to kill a named individual. Witness tried to talk him out of it. Instead they got into Stovall's car and proceeded to look for this individual. The Higgins rifle was on the floorboard of Stovall's car. As they journeyed around, Stovall mentioned that they should rob the gas station. Hexum tried to talk him out of it, but Stovall said "that he wanted to rob the gas station as he did before—it was easy. There was an old man there and he could get about $160.00." They proceeded out toward the gas station. Witness continued to argue with him. The witness told him that we shouldn't do it. "We should go home, forget about it, because if we did, we probably would get caught with this gun and get blamed for that burglary at Lovington." Objection. The court: "Latter portion will be stricken." They turned off to a side road about ⅛th of a mile from the station and walked across the field to the gas station. Stovall told him to take the rifle and he had the rifle at that time. Stovall was armed with a 22-caliber revolver. The witness gave Stovall the rifle. As they entered the station, Stovall yelled at the attendant who was seated behind the counter and told him "he wanted the money—wanted all of it. He didn't want any funny business." The attendant gave him the money from his shirt pocket. Stovall then shot the attendant. They both went back to the automobile and Stovall then told the witness "if I told, he'd kill me, my girl friend and everybody else." It developed on cross-examination that Hexum was a twice-convicted felon; that Stovall had divided the money with him; that he had made several statements to the Assistant State's Attorney which were inconsistent with his testimony on the stand, and he denied that in the presence of defense

197

witnesses Spencer, Mahon, and Fickes that he said or said in substance "I just been in a robbery of a filling station, I killed him. I pulled the trigger. I don't want to live." Hexum was then about 20 years old and Spencer, Fickes and Mahon testified for the defense that he did make such statements which they overheard in the county jail. Two of them were also convicted felons and all three were cotenants of Hexum in the county jail.

Stovall testified about the trip to Lovington and stated that Hexum wanted to rob the station across from the school, but "I didn't want anything to do with it. I had done it before and I didn't want no part in it." He also testified that they stopped the car about ⅛th of a mile from the filling station because he was having trouble with the lights and he drove off the road so that no one would see him as he wasn't supposed to drive. He then testified that Hexum left him and took the rifle out of the car. Pretty soon he came back carrying the rifle saying, "he robbed and killed a guy. Bang, Bang, Bang." He and Hexum had breakfast together the following morning. They went back to the boarding house and there Stovall told Wood he was going to leave. In Wichita, after he, Wood and Galligar arrived there, they talked with a Mr. Gump and told him what had happened and he advised them to turn around and go back and turn themselves in. Stovall denied he was in the filling station on the night of the killing—he denied he had fired a weapon at Russell Crist. Hexum gave him part of the proceeds of the robbery, but he didn't know that it came from the Bolch Service Station. He denied he had told Wood they had driven into the service station to fix the lights; he denied that he heard any shots and stated on direct that he had been previously convicted of burglary in Macon County in 1960.

Donna Galligar, called in rebuttal by the State, confirmed the trip to Wichita, confirmed the statement that

198

Stovall had told them he drove into the Bolch Station to fix his lights and that Hexum went into the service station and on his return said, "he had just shot the man."

■ A careful scrutiny of this record does not support the conclusion that the State was engaged in an unwarranted deliberate attempt to inject improper testimony, improper argument or improper testimony of previous crime into the record within the condemnation of People v. Oden, 20 Ill2d 470, 170 NE2d 582 or People v. Dukes, 12 Ill2d 334, 146 NE2d 14. We think the evidence of their conduct in the earlier hours of the evening was admissible under the rule stated in Brown and that it was admissible to show a common purpose, design and plan to engage in criminal acts and, with weapons in their possession, could likely culminate in death or injury to whatsoever victim they may have selected. We perhaps also should point out that in Oden, Dukes and Donaldson, the jury fixed the penalty and imposed the death sentence. In those cases, the Supreme Court concluded that even though the evidence established the guilt of the defendant beyond a reasonable doubt yet where the jury imposes the penalty, the court should not hazard a guess as to the effect of improper conduct on the part of the State or improper evidence on the part of the State and its effect upon the punishment imposed. We do not deal with that situation here, as here the court imposed the penalty after a full hearing in mitigation and aggravation.

■ We are satisfied that the evidence in this record establishes the guilt of Stovall beyond a reasonable doubt. We cannot say from this record as to whether Hexum or Stovall was the trigger man. If Hexum is believed, it was Stovall. If Stovall is believed, it was Hexum. If Hexum is to be believed, Stovall participated in the events at the station and it makes no difference which

of the two was actually the trigger man. The testimony of Hexum and Stovall as to the actual occurrence events is in direct conflict, a not unusual circumstance when the quality of the witnesses is considered. It was manifestly the obligation of the jury to choose between the two statements, aided by their appearance, conduct and candor in the courtroom. That choice has been made by them and by the trial court and it is not the province of this court to second-guess them unless the evidence fails to establish the guilt beyond a reasonable doubt. We would observe that Stovall's flight from Decatur, his inconsistent statements to Wood and Galligar, his flight from the police officer in Missouri, and his meanderings on the evening in question are not the statements or the conduct of an innocent man and tend to corroborate the Hexum and Wood stories rather than that of the defendant.

■ Defendant complains that the court should not have given People's Instruction No. 12 and that instruction reads as follows:

"A person is responsible for the conduct of another person when either before or during the commission of an offense and with the intent to promote or facilitate the commission of an offense, he solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense."

This instruction is in effect a verbatim statement of the provisions of c 38, § 5–2(c) defining responsibility and accountability. The defendant contends that this ought not have been given for the simple reason that if Stovall is to be believed, he had withdrawn from any further criminal actions when the car broke down and that he was entitled to an instruction on his theory of defense. The difficulty with the defendant's position is

that he does not bring himself within the provisions of § 5–2(3) which would entitle him to claim termination of effort and thus lack of responsibility or accountability. That provision states:

> "Before the commission of the offense, he terminates his effort to promote or facilitate such commission, and does one of the following: wholly deprives his prior efforts of effectiveness in such commission, or gives timely warning to the proper law enforcement authorities, or otherwise makes proper effort to prevent the commission of the offense."

It is patent from the reading of this provision that nowhere in this evidence does Stovall bring himself within § 5–2(3). The instruction of the State was correct and the instruction tendered by the defendant wholly failed to follow the statute.

We therefore conclude that the judgment of the trial court is correct and that it should be and it is affirmed.

Affirmed.

CRAVEN, P. J. and TRAPP, J., concur.