The People of the State of Illinois, Plaintiff-Appellee, v. Angel Pantoja, Defendant-Appellant.

First District (1st Division) No. 60743

Opinion filed January 5, 1976.

Paul Bradley and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Thomas D. Rafter, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BURKE delivered the opinion of the court:

In February of 1973, Angel Pantoja was indicted for armed robbery. (Ill. Rev. Stat. 1971, ch. 38, par. 18—2.) He was convicted at a bench trial and sentenced to imprisonment for not less than 20 years and not more than 60 years. Defendant raises three issues on appeal: (1) the State failed in its duty to provide a fair trial by not extending an offer of immunity to a defense witness who refused to testify during direct examination on the ground that his answers might be self-incriminating; (2) the defendant was not proven guilty beyond a reasonable doubt; and (3) the sentence was excessive.

Saul Algarin, the principal complaining witness, testified that on December 12, 1972, at approximately 4 p.m., he was walking in the area of Evergreen Street and Milwaukee Avenue in Chicago for the purpose of purchasing a baby crib at a nearby store. It had been sleeting and snowing during most of the day. Algarin stopped by chance to speak with a man named Tony Diaz, whom Algarin had known for about a week. Shortly thereafter, Algarin and Diaz were approached by two men, the defendant and a man named Nelson Roldan, who asked for assistance in pushing their parked car from the snow. As the four approached a 1964 white Thunderbird parked on Evergreen Street near an alley, the defendant placed a gun to the head of Diaz and ordered him to "give what you got" in Spanish. Roldan grabbed Algarin's hair from behind and applied a "blade" to the right side of his neck. Algarin sustained a cut between his chin and shoulder. Roldan released Algarin's hair and took $87 from Algarin which was the proceeds of a paycheck cashed by Algarin earlier in the day. Defendant used his right hand to search the pockets of Diaz. Algarin saw the defendant transfer his hand from the pockets of Diaz to his own pockets. However, Algarin did not see the

defendant take a wrist watch from Diaz. Algarin and Diaz were ordered to turn around and walk in the opposite direction. Defendant and Roldan escaped by driving into an alley in their white Thunderbird.

Algarin and Diaz then stopped a friend in a passing car who drove them to Schiller Street where two police officers were sitting in a parked patrol car. After describing the robbery, Algarin and Diaz entered the squad car and proceeded with the officers to Damen Avenue. The white Thunderbird was spotted and curbed. Defendant and Roldan were searched and taken to the 13th District Police Station.

While at the police station, defendant asked Algarin and Diaz in Spanish not to sign a complaint because defendant's young family needed his continued support. Defendant revealed that the gun and the money were in a particular spot in the alley near the place where the robbery occurred. Shortly thereafter, the police conducted a search in the spot described by the defendant but found nothing. Algarin testified that this same conversation did not refer to any type of narcotics, and that he is not a drug addict. Algarin stated that he described the blade which Roldan had used to cut him as "a razor that they use at a barber shop" before the police showed him the weapon. Diaz told the police that his wrist watch and a total of $134 were stolen. The first time Algarin learned that the wrist watch had been taken was at the police station.

Theodore Bokota, a police officer for 18 years, testified that on December 12, 1972, he and his partner were parked in a marked car at Schiller Street and Damen Avenue when they were approached by an automobile with three men in it. Officer Bokota noticed a "straight hairline" cut, about "two and a half inches long," on the right side of Algarin's neck. After Algarin and Diaz related the account of the robbery, they entered the squad car to assist the police in locating the white "T" bird. Traffic was "bumper to bumper" that afternoon with poor visibility and little traction. When Officer Bokota curbed the Thunderbird driven by defendant and Roldan, traffic was in front and behind them. Defendant and Roldan did not resist the officers. A weapons search revealed a straight razor in the possession of Roldan but no gun was found. Defendant and Roldan were handcuffed and taken to the police station.

Algarin reported to Officer Bokota that a total of $134 was stolen from himself and Diaz. According to Diaz, Algarin was in possession of money which belonged both to himself and Diaz. Officer Bokota stated that there was a "little confusion" as to exactly how Algarin gained possession of the money. Algarin also told Officer Bokota that defendant carried a .22-caliber revolver during the robbery. Before being presented with the weapon found on Roldan, Algarin described Roldan's "blade" as "one of those things you shave with and brown handle." Officer Bokota then

produced a barber's razor with a 2½-inch long blade which the officers had found on Roldan.

Officer Bokota searched the defendant at the police station and discovered $73 and a wrist watch in his left pants pocket. A People's Group Exhibit evidenced seven $10 bills and three $1 bills. Neither Diaz nor the defendant claimed ownership of the wrist watch at the time it was removed from the defendant. Roldan was not carrying any money. A conversation in Spanish then transpired among the defendant, Roldan, Diaz and Algarin. Bokota testified that Diaz and Roldan were "going at it hot and heavy," while Algarin was not angry but was "the calmest one of the bunch." The conversation became so "heated" that Officer Bokota took the two prisoners to a cell "before a fight started." Since Officer Bokota was unable to understand Spanish, he could not determine the content of the conversation. Ten minutes later Diaz indicated that his watch was missing. A lockup keeper retrieved the watch from the defendant.

Tony Diaz, one of the original complainants, was brought from the Illinois State Penitentiary in Pontiac to appear as the first witness for the defense. Diaz is 18 years old and was serving a sentence for the sale of heroin. Diaz began his testimony by stating that he had sold heroin to Algarin on December 12, 1972. The trial judge interrupted the direct examination and advised Diaz that he had a constitutional right not to incriminate himself. The trial judge further informed Diaz that his testimony might prove to be incriminating. Diaz replied "yes" on several different occasions when asked by the trial judge if he understood the warning. Upon the suggestion of the Assistant State's Attorney, and with full agreement of Diaz, the court appointed a Public Defender to represent Diaz. After consulting with Diaz, the Public Defender advised the court that further testimony might result in criminal sanctions, and that Diaz had decided not to testify. Defense counsel for the defendant then offered a motion to withdraw Diaz as a witness and to strike Diaz' testimony from the record. The Assistant State's Attorney did not offer an objection to defendant's motion. It is clear from the record that the State had not interviewed Diaz prior to the time he took the stand, nor did the State have any indication of what Diaz would answer upon further examination. Diaz was allowed to be withdrawn by the defendant and all previous statements by Diaz were stricken from the record. Defendant subsequently offered a motion for a new trial wherein it was alleged that Diaz had been uncertain of his decision not to testify and that he indicated that he wanted additional time to consider the matter.

The defendant testified in his own behalf. On December 12, 1972, at approximately 4:30 p.m., defendant left an automobile repair shop named

Bruno's Garage, where he had been employed on a part-time basis as a mechanic. Defendant, driving his 1964 Thunderbird, picked up Nelson Roldan at the corner of Milwaukee and Damen Avenues. Pursuant to Roldan's request, defendant drove Roldan to Milwaukee and Evergreen in order "to meet some people." The defendant sat in the car and waited while Roldan spoke with Diaz and Algarin. Roldan returned to the car and said, "Let's go." Five minutes later, the two were stopped by the police.

A wrist watch and $73 were found on the defendant at the police station. Defendant claimed that the $73, in denominations of $1, $5 and $10 bills, was from a paycheck he had cashed the previous day. Defendant's description of the denominations did not correspond to the actual denominations of the bills found in the People's Exhibit. Defendant claimed that he owned the wrist watch for six years and that he had been wearing it every day for the last two weeks. The watch was in his pocket, not on his wrist, because he had been working as an automobile mechanic earlier in the day. Defendant, however, did not know the brand name of the watch.

Defendant also testified that an argument ensued among Algarin, Roldan and Diaz at the police station. Roldan accused Diaz of selling him "bad" heroin. Roldan found Diaz that afternoon for the purpose of taking back money which Roldan had paid Diaz for the "bad stuff." Defendant stated that he did not pay too much attention to the argument and did not say anything. Defendant did not know if Roldan was using narcotics. Defendant denied that he placed a gun to the head of Diaz, robbed Diaz or Algarin of money, or robbed Diaz of a wrist watch. Defendant claimed that he did not hide a gun or money in the alley at any time. On cross-examination, the defendant stated that he had been in the penitentiary on two previous occasions for burglary; the first time he served concurrent sentences for four burglaries, and the second time he served concurrent sentences for three burglaries. Defendant admitted that he was addicted to narcotics during his period of incarceration in the penitentiary.

Defendant first contends that the State failed in its duty to provide a fair trial by not extending an offer of immunity to Diaz after he was permitted to be excused as a witness on grounds that his answers might be self-incriminating. Defendant raises several arguments under this contention. He argues that Diaz was intimidated into refusing to testify by the warnings of the court and by his court-appointed counsel, the Public Defender. Defendant suggests that Diaz' refusal to testify was equivocal and uncertain for two reasons: the Public Defender exercised the Fifth Amendment privilege for him, and Diaz allegedly indicated to the Pub-

lic Defender prior to leaving the criminal court building that he wanted additional time to consider the matter. Defendant additionally argues that immunity should have been used as a tool to extend the fact finding ability of the court.

■■ It is not improper for a court to warn a witness, appearing without the benefit of counsel, of his privilege against self-incrimination. (*Layton v. State* (Ind. 1973), 301 N.E.2d 633.) Although a trial judge is not under an affirmative obligation to so advise (*Bolen v. People*, 184 Ill. 338, 56 N.E. 408), it is clearly within his discretion to warn a witness of potential incrimination where the need appears. (*State v. Brown* (Me. 1974), 321 A.2d 478; *State v. Mattatall* (R.I. 1975), 337 A.2d 229.) Holdings from other jurisdictions have applauded the practice as "commendable" (*Commonwealth v. Slaney* (1962), 345 Mass. 135, 185 N.E.2d 919), and as a reflection of "proper concern" for an unappreciative witness. *People v. Cooper* (1968), 268 Cal.App.2d 34, 73 Cal. Rptr. 608.

The defense witness, Tony Diaz, was serving a sentence in the penitentiary for a conviction of the sale of heroin on an occasion different from the incident in question. It is manifestly clear from the record that Diaz was not aware that he was in danger of subjecting himself to further prosecutorial actions on the basis of his in-court testimony. We believe that under the circumstances, it was appropriate for the attentive trial judge to inform the witness of his Fifth Amendment rights and to appoint a Public Defender for the purpose of consultation.

■■ Defendant's argument that the State failed to insure him a fair trial has no merit. The State's Attorney in his official capacity is the representative of all the people, and it is his duty to safeguard the constitutional rights of the defendant as well as any other citizen. (*People v. Oden*, 20 Ill.2d 470, 170 N.E.2d 582.) It was within the duty of the State's Attorney in this instance to suggest to the court that a Public Defender be appointed for Diaz. The record does not disclose any fact which suggests that the court, the State's Attorney, or the Public Defender assigned to Diaz intimidated him into silence. A party seeking to question a witness may not complain that the witness was intimidated into silence on the basis that the witness is advised of his privilege against self-incrimination. *United States ex rel. Robinson v. Zelker* (2d Cir. 1972), 468 F.2d 159; *State v. Brown* (Me. 1974), 321 A.2d 478.

■■ We cannot agree with defendant's argument that the Public Defender's representation to the court that Diaz had decided not to testify because further testimony might be self-incriminating was a form of intimidation. The record indicates that Diaz agreed to consult with a court-appointed Public Defender. Diaz did, in fact, consult with the Public Defender during a court recess. In the presence of Diaz, and

without his objection, the Public Defender informed the court of Diaz' decision not to testify. Although the general rule is that a witness must exercise the privilege against self-incrimination personally, counsel for the witness may invoke the privilege on the witness' behalf under the proper circumstances. (*People v. Myers*, 35 Ill.2d 311, 220 N.E.2d 297; 8 Wigmore, Evidence § 2270 (McNaughton rev. 1961); see *People v. Sailor*, 43 Ill.2d 256, 253 N.E.2d 397.) There is no suggestion in the record that Diaz' decision was equivocal or the product of intimidation.

We must further note that defendant did not argue at trial that Diaz failed to personally exercise his privilege. Instead, defendant's counsel moved that Diaz be withdrawn as a defense witness and that his testimony be stricken from the record. Neither the court nor the State's Attorney prevented Diaz from testifying any further.

■■ Contrary to the defendant's insistence, the State did not have an obligation to offer immunity to Diaz in order to gain relevant evidence for the defendant on direct examination. The Illinois Code of Criminal Procedure provides that it is within the discretion of the State, with court approval, to grant immunity for the purpose of securing evidence. (Ill. Rev. Stat. 1971, ch. 38, art. 106; see Ill. Ann. Stat. ch. 38, art. 106, Committee Comments (Smith-Hurd (1970).) In this instance, the State had not interviewed Diaz before he took the stand, nor did the State know the content of the testimony to be given by Diaz. The statute, and indeed the common practice, does not contemplate a grant of immunity to a defense witness for the purpose of securing evidence on direct examination by the defendant. A defendant does not have a constitutional right to compel the State to confer immunity upon a defense witness who has exercised his privilege against self-incrimination. *United States v. Ramsey* (7th Cir. 1974), 503 F.2d 524.

We cannot agree with defendant's second contention that the evidence was insufficient to prove him guilty beyond a reasonable doubt. The testimony of Saul Algarin, the complaining witness, was positive and, contrary to defendant's assertions, consistent with the testimony of Officer Bokota. Algarin testified that his neck was cut by Roldan with a blade described as "one of those things you shave with and a brown handle." Algarin reported his description to Officer Bokota at the police station before Bokota produced a barber's razor which was found on Roldan. Officer Bokota's testimony about Algarin's cut and the blade description corroborated Algarin completely.

Defendant's theory that a drug transaction had transpired was rejected by the trial court. It is unlikely that Algarin and Diaz would fabricate a report of an armed robbery minutes after its occurrence and risk self-incrimination upon further investigation by the police. The defendant

asked Algarin in Spanish at the police station to refrain from signing the complaint in exchange for the knowledge of the whereabouts of the money and the revolver. Algarin related defendant's request to the police in English. The police searched the area in the alley but found nothing. If a drug deal had taken place, it is more probable that Algarin and Diaz would not have signed a complaint at the police station; instead, they would have returned to the alley themselves in the hope of finding the drugs, the money not found on the defendant and Roldan, and the .22-caliber revolver.

Algarin and Officer Bokota both testified that a total of $134 was reported stolen. Although Diaz' wrist watch and $73 was found on the defendant and Roldan at the police station, there was ample time to hide the other money and the revolver in the alley into which the two drove their 1964 Thunderbird after the robbery.

■■ When a jury is waived, the credibility of the witnesses, the weight to be afforded their testimony, and the inferences which may be drawn from the testimony presented are within the determination of the trial court who saw and heard the witnesses testify. (*People v. Pride,* 16 Ill.2d 82, 156 N.E.2d 551; *People v. Arnold,* 2 Ill.2d 92, 116 N.E.2d 882.) The testimony of a single witness, if positive and credible, is sufficient to convict even though it is contradicted by the accused. (*People v. Guido,* 25 Ill.2d 204, 184 N.E.2d 858; *People v. Perkins,* 17 Ill.App.3d 447, 308 N.E.2d 171.) Where the evidence is merely conflicting, this court will not substitute its judgment for that of the trial court. (*People v. Dillon,* 24 Ill.2d 122, 180 N.E.2d 503.) Algarin's testimony is positive and credible. Defendant's testimony contains inconsistencies and his version of the incident is untenable. The record in this case clearly establishes defendant's guilt of armed robbery beyond a reasonable doubt.

■■ Defendant's final contention is that the sentence is excessive. The sentence imposed severely diminishes the possibility of defendant's rehabilitation. (*People v. Ike,* 7 Ill.App.3d 75, 286 N.E.2d 391.) Pursuant to the authority granted this court under Supreme Court Rule 615(b)(4), we reduce the armed robbery sentence to a minimum of 10 years and a maximum of 30 years. Ill. Rev. Stat. 1973, ch. 110A, par. 615(b)(4); *People v. Jones,* 60 Ill.2d 300, 325 N.E.2d 601.

Judgment affirmed as modified.

GOLDBERG, P. J., and SIMON, J., concur.