(No. 50890.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. ROBERT K. CARLSON, SR., Appellant.

*Opinion filed April 18, 1980.—Rehearing denied May 29, 1980.*

UNDERWOOD, J., concurring in part and dissenting in part. CLARK and MORAN, JJ., dissenting.

Mary Robinson, Deputy Defender, and Mark Schuster, Richard E. Cunningham and Martin Carlson, Assistant Defenders, of the Office of the State Appellate Defender, of Elgin (Robert Davison, Verlin Meinz, John Reid and Charles Scheidel, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Dennis P. Ryan, State's Attorney, of Waukegan (Donald B. Mackay, Melbourne A. Noel, Jr., Thomas E. Holum, Carolyn B. Notkoff and Mark L. Rotert, Assistant Attorneys General, of Chicago, and Ann W. Regan, Assistant State's Attorney, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Aaron L. Meyers, and John Thomas Moran, Assistant Public Defenders, of counsel), *amicus curiae.*

MR. JUSTICE RYAN delivered the opinion of the court:

The defendant, Robert K. Carlson, Sr., was sentenced to death in the circuit court of Lake County. The appeal has come directly to this court. (Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603.) The defendant argues that numerous errors were committed in his convictions on two murder charges and an arson charge. He also challenges

the validity of the imposition of the death penalty.

The defendant was charged by an indictment in Lake County with the murder of his former wife, Rosemary Carlson, and the arson of her residence. He was also indicted for the murder of Waukegan police officer Harry White and for the attempted murder of Waukegan police officer Charles Mason. The attempted murder charge was later dropped. On defendant's motion, the two cases were consolidated for trial. The defendant pleaded not guilty to the charges. The jury found the defendant guilty of one count of arson and two counts of murder. The State requested that a hearing be conducted in order to determine the appropriateness of the imposition of the death penalty in the case involving the murder of Officer White. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) The defendant requested that there be only one sentencing hearing for all convictions. He also waived the right to have a jury determination of whether the death penalty should be imposed. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) Following the penalty hearing the court sentenced the defendant to 6 1/3 to 20 years for arson and 50 to 100 years for the murder of his former wife. The court sentenced the defendant to death for the murder of the Waukegan policeman, White. The trial court entered an order staying the execution of the death sentence, pending direct appeal to this court.

On August 12, 1977, after 19 years of marriage, Rosemary Carlson was granted a divorce from the defendant. In this case the defendant testified that he had agreed not to contest the divorce on the condition that Rosemary would not entertain men at the house. Carlson quitclaimed his interest in the marital residence to Rosemary. Although he moved out of the house, the defendant and Rosemary continued to see one another. Carlson testified that remarriage was planned for October 18, 1977; Rosemary, however, postponed the wedding date. On Wednesday,

November 9, 1977, Rosemary called the defendant and told him that because she had a "boyfriend," she would not be seeing the defendant as frequently as before. Before the defendant went to work the following day, Rosemary came to his apartment for money. During this visit, she again discussed her boyfriend. The defendant testified that he was "stunned" by the news of her boyfriend. He stated that he decided to go to Las Vegas and he arranged to buy a gun at work purportedly for protection on his trip. On Friday, November 11, 1977, the defendant purchased a gun and ammunition from a coworker. He testified that after work he wrapped the loaded gun in a towel and placed it on his car's front seat. The next day, Saturday, November 12, 1977, the defendant went to the bank, withdrew the money in his account and cashed some traveler's checks. In the evening the defendant drove past Rosemary's house twice with the purported intent to give Rosemary money. Each time he saw a strange car in the driveway, so he did not stop. The defendant "got mad," assuming that Rosemary was entertaining a man at the house, contrary to the oral agreement they had made. He purchased two gasoline cans and filled them with gasoline. He placed the filled gasoline cans in the trunk of his car. He testified that he planned to burn the house down the next day when Rosemary drove their son Eric to school. He stated, however, that late that night, while lying in bed, he realized that he could not burn down the house because it would cause Rosemary to go to her boyfriend.

The following day, Sunday, November 13, 1977, Rosemary called the defendant to ask him to accompany her and Eric to Lake Geneva, Wisconsin, where Eric attended school. Before going, he picked up some medication for Rosemary. At the school, the defendant put money in both Eric's personal account and in his quartermaster account. After leaving Eric at the school, the defendant and Rosemary shopped and he bought her a

sweater. They had dinner in Lake Geneva and returned to Rosemary's house. On the way home, Rosemary again talked about her boyfriend and showed the defendant a diamond engagement ring which had been given to her by her male friend. She told the defendant that her boyfriend wanted to build her a house and buy her a business. She informed Carlson that her boyfriend put $3,000 in a savings account for her and bought her a vacuum cleaner. Upon arriving at the house the defendant noticed a new typewriter, television and coin bank. Rosemary told him that these were gifts from her boyfriend and that the coin bank was given to her when her friend opened the savings account. The defendant testified that seeing these items made him realize that everything his wife had said was true.

Carlson stated that the next thing he could remember was lifting his former wife from the floor. Expert testimony at trial revealed that Rosemary had been shot 10 times. It is not clear from the evidence, but at some time on the same day, Sunday, the defendant had brought the gasoline cans into the house. On his way in, some children playing near the house saw the defendant, but they testified he was not carrying anything resembling gasoline cans. However, it is uncontroverted that the defendant poured gasoline throughout three rooms and set fire to the house. Upon leaving the house, the defendant greeted some of the boys playing in front of the house. Within minutes, the boys noticed flames in the house and called the fire department. The fire was reported at approximately 6:20 p.m. Firemen found Rosemary's body in the debris. An autopsy showed death to be a result of multiple gunshot wounds. Testimony was admitted which indicated that, since there was little soot or smoke in her lungs, Rosemary was dead before the fire began.

After leaving the house, the defendant proceeded to a bar. There he encountered a coworker, Stanley Wilson.

After an unsuccessful attempt to telephone his daughter, the defendant told Wilson of his plans to leave for California that night. He gave Wilson $3,200 in cash in an envelope to pay for Eric's education. He asked that the money be forwarded to his daughter who resided in Wisconsin. The defendant also sold Wilson his tools and television set for $200. After these transactions, the defendant and Wilson continued to sit and drink in the bar for some time. At approximately 9:40 p.m., three police officers and an assistant State's Attorney came to the bar to arrest the defendant. Another police officer, Sergeant Hauri, the only one in uniform, entered minutes later. The defendant testified that he was aware that the persons were police officers. Captain Mason, Sergeant Joiner and the deceased, Sergeant White, approached the area where the defendant and Wilson were seated on bar stools. Captain Mason stood behind Wilson and, believing Wilson to be the defendant, mistakenly grabbed Wilson and said, "Bob, you're under arrest." Sergeant White stood behind the defendant and said, "Mr. Carlson, you have to come with us." It is uncontroverted that as the officers approached, the defendant had taken a gun out of his waistband. According to the testimony of Sergeant Hauri, the defendant faced Sergeant White, and two muzzle flashes reflected off of Sergeant White's shirt. White fell toward the defendant, pulling the defendant to the floor. They struggled for several seconds on the floor, during which time three or four more shots were fired by the defendant. Another bullet hit White and a bullet went through the defendant's upper left arm. Captain Mason was shot through his left ankle and sustained an injury to his left buttocks due to a ricocheted shot. Sergeant Joiner finally managed to wrest the gun from the defendant's right hand. White was taken to a hospital where he died that evening. The autopsy revealed that White died of bullet wounds to the chest.

At the trial the defendant raised the defense of insanity as to the charge of murder of his ex-wife, Rosemary, and as to the arson charge. Concerning the charge of murder of Sergeant White, it was the defendant's contention that when the police officer approached him in the tavern, he was going to commit suicide and as he was attempting to do so, the officer was shot during the struggle that ensued. It is the defendant's position that he is therefore guilty of no more than involuntary manslaughter as to Sergeant White's death.

Before trial the public defender filed a motion requesting that the prospective jurors not be questioned about their views on the imposition of the death penalty due to the alleged unconstitutionality of the statute. This motion was denied. The State had informed the court and counsel that the death penalty would be sought. During *voir dire* examination several jurors were excused due to their response that they would conscientiously be unable to impose the death sentence.

Following conviction the court held a death sentencing hearing pursuant to the State's request. Although the State informed the court that it was seeking the death penalty only for the conviction based on the murder of Sergeant White, counsel mutually agreed to consolidate the convictions into one sentencing hearing. Evidence was heard in aggravation to establish beyond a reasonable doubt that White was a police officer on November 13, 1977; that he had been assigned to investigate the homicide of Rosemary Carlson; that the defendant was more than 18 years old; and that the defendant knew that White was a police officer in the exercise of his official duties.

In mitigation, the defendant offered the testimony of Dr. Gerald Frank, an internist who treated the defendant for five years. His testimony will be discussed later. He observed that during a year or two prior to November

1977 the defendant had undergone a process of "physical and emotional deterioration." Dr. Leo Goldman, a psychiatrist, testified in mitigation that the defendant was "most unlikely to commit such an offense" in the future, and that the defendant was "extremely distraught" at the time he shot Sergeant White. The defendant also testified in mitigation at the sentencing hearing. He expressed remorse for his acts and stated that he never intended to kill anyone but himself.

The court found beyond a reasonable doubt that the defendant, a 46-year-old man, had murdered a peace officer in the course of the performance of his official duties, knowing that the murdered individual was a peace officer. Moreover, the court found that the defendant was not attempting to commit suicide at the time of the murder and that the defendant was not acting under the influence of extreme mental or emotional disturbance when the murder was committed. Finally, the court found that although the defendant did not have a significant history of prior criminal activity, that factor was diminished greatly, if not totally extinguished, by the defendant's convictions for murder and arson, and was thus not sufficient to preclude the imposition of the death penalty.

The defendant raises many issues on this appeal which we will address. However, inasmuch as we find the death sentence to be inappropriate to this case, we need not address those issues raised concerning the constitutionality of the Illinois statute. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1.) Similar issues concerning the validity of our statute were raised and resolved in our recent opinion of *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531.

Defendant now contends that there were numerous trial errors which require reversal of his convictions. We note that several of these alleged errors were not objected to by the defendant at trial. We therefore consider they

have been waived.

It is fundamental to our adversarial system that counsel object at trial to errors. (*People v. Roberts* (1979), 75 Ill. 2d 1, 10.) The rationale underlying this procedural requirement is based on the need for timely resolution of evidentiary questions at trial. (*People v. Linus* (1971), 48 Ill. 2d 349, 355.) Thus, we have generally held that the failure to object to the admission of evidence operates as a waiver of the right to consider the question on appeal. *People v. Newbury* (1972), 53 Ill. 2d 228, 238-39; *People v. Scott* (1972), 52 Ill. 2d 432, 439, *cert. denied* (1973), 410 U.S. 941, 35 L. Ed. 2d 607, 93 S. Ct. 1406; *People v. McCorry* (1972), 51 Ill. 2d 343, 349; *People v. Linus* (1971), 48 Ill. 2d 349, 355.

We recognize, however, that the waiver doctrine is not absolute. (See *People v. Burson* (1957), 11 Ill. 2d 360.) Our Rule 615(a) embodies the exception to the waiver rule. It provides, in part:

"Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 73 Ill. 2d R. 615(a).

A significant purpose of the plain error exception to the waiver doctrine is to correct any serious injustices which have been done to the defendant. It therefore becomes relevant to examine the strength or weakness of the evidence against him; if the evidence is close, there is a possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved. Thus, this court has held that where the evidence is closely balanced, a court of review may consider errors that have not been properly preserved for review. *People v. Howell* (1975), 60 Ill. 2d 117, 121; *People v. Pickett* (1973), 54 Ill. 2d 280, 283.

In addition to the protection of the defendant in cases where the evidence is closely balanced, the plain error rule also encompasses those errors of such magnitude

that the commission thereof denies the accused a fair and impartial trial. *People v. Manzella* (1973), 56 Ill. 2d 187, 195.

If a timely objection is made at trial, either to improper interrogation, or to an improper remark by counsel to the jury, the court can, by sustaining the objection or instructing the jury to disregard the answer or remark, usually correct the error. (*People v. Wilson* (1972), 51 Ill. 2d 302, 308-09 (court cured prejudice that may have resulted from inadmissible evidence); *People v. Baptist* (1979), 76 Ill. 2d 19, 30 (court cured prejudicial effect of final argument).) There are situations, however, where the error is so damaging that such action by the trial judge cannot erase its prejudicial effect. See *People v. Garreau* (1963), 27 Ill. 2d 388, 391 (prejudicial effect of remarks in final argument not cured by sustaining objections to the remark and admonishing the jury to disregard them); *People v. Polenik* (1950), 407 Ill. 337, 347 (prejudicial effect of interrogation not cured by sustaining objection); *People v. Gregory* (1961), 22 Ill. 2d 601, 605 (prejudicial effect of inadmissible evidence not cured by the court's sustaining the objection and giving a cautionary instruction).

The failure of counsel to object at trial waives those errors which the court can correct by sustaining an objection and admonishing the jury. Otherwise, counsel, by not giving the court the opportunity to prevent or correct error at trial, will gain the advantage of obtaining a reversal through his own failure to act, either intentionally or inadvertently. Whether or not the erroneous evidence or remarks were objected to at the trial, a court of review will grant relief if the trial error is so prejudicial that real justice has been denied or the verdict of the jury may have resulted from such error. (*People v. Wright* (1974), 56 Ill. 2d 523, 533-34; *People v. Manzella* (1973), 56 Ill. 2d 187, 200.) We thus construe the plain error rule to be a limited

exception to the waiver doctrine. As we stated in the case of *People v. Precup* (1978), 73 Ill. 2d 7, 16:

"Rule 615(a) does not operate in the nature of a general saving clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court."

Applying the above, we find that several of defendant's alleged errors relating to his conviction of the murder of Rosemary and of arson were unobjected to. They do not tend to negate his defense of insanity. The defendant does not deny that he killed his ex-wife or that he set fire to the house. The alleged errors could not therefore be so great that it would reasonably appear that the jurors had been influenced or prejudiced to the extent that they could not be fair or impartial. (See *People v. Manzella* (1973), 56 Ill. 2d 187, 200.) The alleged trial errors involve evidence of Rosemary's lifestyle since her divorce, testimony about her facial expression after she was killed, testimony concerning her missing diamond ring, testimony that the assistant State's Attorney told the officers there was probable cause to arrest the defendant for murder and arson, and the interrogation of the son of the defendant and Rosemary concerning an argument between his parents. These items were not properly objected to and therefore have been waived.

Defendant argues that the prosecutor, in suggesting that defendant made a prior inconsistent statement, substantially prejudiced the defendant before the jury. This contention is based on the following exchange during the cross-examination of defendant:

"[The prosecutor]. And he took it [the gun] out of your hand because you were still firing on the ground; isn't that correct?
A. I don't know.
Q. You don't remember?

A. No, I don't remember.

Q. As a matter of fact, when you first talked to a police officer in the Waukegan police department, you told them you didn't remember what happened at Rosemary's house, didn't you?

A. Yes.

Q. As a matter of fact, you told them that you drew a blank on what happened at the bar, too, didn't you?

A. No. I remember what happened in the bar.

Q. Didn't you first tell them, 'I'm sorry. I don't know. I just went blank.'?

A. No, I don't think I did."

The defense counsel did not object to this interrogation. However, at the close of defendant's case, defense counsel wanted to make an offer of proof as to a statement the defendant had made to the police officers following his arrest. The defense counsel stated, "It is consistent with his testimony—Carlson's testimony on the stand *concerning the homicide of Rosemary Carlson.*" (Emphasis added.) The prosecutor objected, stating there had been no impeachment of the defendant by proof of prior inconsistent statements. The court stated he did not recall any and asked defense counsel what were the inconsistencies. Defense counsel replied, "There was no inconsistency that was brought out. There was the suggestion of inconsistencies." The court denied the offer.

We first note that the offer was apparently to reestablish Carlson's testimony concerning the homicide of Rosemary Carlson and not what he said concerning whether he remembered what happened in the tavern. Also there had been no proof by the prosecution that a prior inconsistent statement had, in fact, been made. From reading the transcript it is apparent that this is the reason the court denied the offer. Defendant contends that the exchange quoted above insinuates that he had made a prior statement inconsistent with his testimony and that this damaged his credibility. It is clear that the prosecutor

was not attempting to prove that the defendant had made a prior statement to the officers which was inconsistent with his testimony. The defendant was being cross-examined concerning the shooting in the tavern and he had said that he didn't know if the gun was taken from him because he was still firing it. This line of interrogation plainly does not come within the holding of *People v. Nuccio* (1969), 43 Ill. 2d 375, relied on by the defendant. In that case, during cross-examination, there were deliberate insinuations both as to prior statements and as to conduct that were very prejudicial. The State made no attempt later to call witnesses to prove that which had been implied during the cross-examination.

Defendant next contends that he was not proved sane beyond a reasonable doubt at the time he shot Rosemary and set fire to the house. The insanity defense (Ill. Rev. Stat. 1977, ch. 38, par. 6—2) was raised by the testimony of the defendant and by Dr. Leo Goldman, a psychiatrist. While the evidence presented was sufficient to raise the issue of the defendant's sanity at the time of the commission of the offenses (Ill. Rev. Stat. 1977, ch. 38, pars. 3—2, 6—4), we find that the State thereafter satisfied its burden of proving sanity at the time of the offenses beyond a reasonable doubt (*People v. Skeoch* (1951), 408 Ill. 276). Although the defendant's evidence was convincing, our review of the record discloses ample lay and expert testimony in support of the sanity finding. "The record presents a question of fact to be determined by the trial court [the factfinder]. Its decision will not be reversed unless the determination is so improbable or unsatisfactory as to raise a reasonable doubt as to defendant's sanity." *People v. Ward* (1975), 61 Ill. 2d 559, 568.

As to the State's expert witness on the insanity issue, the defendant insists that the trial court erred when it admitted his opinion. According to the defendant, the opinion was based partially on police reports which con-

tained inadmissible hearsay. A review of the record indicates that defendant objected to the State's question which was put to the psychiatrist following his testimony that his opinion was based partly on an examination of the defendant and partially on police reports: "And in those reports were there observations made of the defendant by his family, friends, coworkers, and other individuals who saw the defendant at times close to the commission of the crime and the killing of Rosemary Carlson?" In a conference outside of the hearing of the jury, the judge, in effect, reserved his ruling due to the fact that he was unable, at that point in the proceeding, to ascertain what the psychiatric opinion was based on. When the trial resumed, the State asked the witness, "Doctor, what did you base your opinion on?" The doctor replied, "The opinion is principally based on my own findings and what the defendant told me." No objection was then made by defense counsel. Furthermore, the defendant's cross-examination of this witness did not disclose to what extent, if any, the witness based his opinion on anything in the police report. Inasmuch as the record does not support a finding that the State's psychiatric witness based his opinion on inadmissible hearsay, we reject this argument.

Defendant's next assignment of error concerns the propriety of the verdict forms which were given to the jury. The forms were tendered by the State during the instructions conference and were subsequently given to the jury without objection. For the arson charge and the charge of Rosemary's murder, three possible verdicts were given to the jury: guilty, not guilty and not guilty by reason of insanity. The latter verdict form read:

"We, the jury, find the defendant, ROBERT K. CARLSON, SR., Not Guilty of the murder of Rosemary Carlson by reason of insanity and we further find that he has recovered from his condition of insanity."

A similar form of verdict was given for the arson charge. It is undisputed that these verdict forms did not conform to the statute then in effect.

Prior to August 1, 1977, section 115—4(j) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 115—4(j)) required that if a verdict of not guilty by reason of insanity was returned the jury must also state in its verdict whether or not the defendant had recovered from his former condition of insanity. However, effective August 1, 1977, this last provision was deleted from the statute, which then provided only that in the event of a verdict of not guilty by reason of insanity a hearing should be held pursuant to the Mental Health Code to determine whether defendant is in need of mental treatment. (Ill. Rev. Stat. 1977, ch. 38, par. 115—4(j).) Thus, by the inclusion of the recovery phraseology, the jurors were presented with superfluous language. Defense counsel failed to tender verdict forms or to object to the giving of these forms. He also failed to specify this objection in his motion for a new trial. Such failure constitutes a waiver on review. See *People v. Roberts* (1979), 75 Ill. 2d 1; *People v. Underwood* (1978), 72 Ill. 2d 124.

The defendant asserts that the State failed to prove him guilty beyond a reasonable doubt of the murder of Sergeant Harry White. It was defendant's position at trial, and he so testified, that when the officers apprehended him in the tavern, he attempted to kill himself and that Sergeant White was shot in the struggle for the gun. It is defendant's position that the evidence only shows that he acted recklessly and was therefore chargeable with involuntary manslaughter, not murder. This, of course, was a question of fact for the jury to determine. An involuntary manslaughter instruction, as well as a murder instruction was given to the jury. In addition to the defendant's testimony concerning the events in the

tavern, there was the testimony of his companion at the bar and of the officers and others. The credibility of these witnesses and the weight to be given to their testimonies were properly determined by the jury. (*People v. Stringer* (1972), 52 Ill. 2d 564, 568.) We will not reverse a conviction unless the evidence is so improbable as to justify a reasonable doubt of the defendant's guilt. (*People v. Owens* (1976), 65 Ill. 2d 83, 90.) We cannot say that the evidence in this case raises a reasonable doubt of the defendant's guilt of the murder charge.

Defendant contends next that he was denied a fair trial when the court did not give a jury instruction defining "recklessly" in conjunction with the involuntary manslaughter instruction given with reference to the death of Sergeant Harry White. The jury was given the following instruction tendered by defense counsel:

> "A person commits the crime of involuntary manslaughter who causes the death of another by acts which are performed recklessly and are likely to cause death or great bodily harm to another."

This instruction is Illinois Pattern Jury Instruction, Criminal, No. 7.07 (1968) (hereinafter IPI). The defendant contends that the court should also have given IPI Criminal No. 5.01, which defines "recklessly," which the committee note states should be given with instruction No. 7.07. Although the defendant tendered the above involuntary manslaughter instruction, he did not tender an instruction defining "recklessly."

We view *People v. Underwood* (1978), 72 Ill. 2d 124, controlling on this point. In that case we stated the general rule with regard to criminal instructions: the burden of preparing jury instructions is primarily on the parties, not the trial court; generally, the trial court is under no obligation either to give instructions not requested by counsel or to rewrite instructions tendered by counsel, and no party may raise on appeal the failure to give

an instruction unless he shall have tendered it. In *Underwood* we distinguished *People v. Joyner* (1972), 50 Ill. 2d 302, pointing out that in the latter case the court had failed to instruct on a lesser included offense—an offense of which the defendant could have been found guilty. In *Underwood* the failure was not to instruct on an essential element of the case but was only a failure to give a definitional instruction on the meaning of "reasonably believes" as used in the self-defense instruction which was given in that case. We held that the failure to *sua sponte* give the definitional instruction was not error. The same reasoning applies here. The failure of the court to *sua sponte* give an instruction defining "recklessly" was not a "substantial defect" in the instructions, and the failure of the defendant to tender the instruction waived his right to now complain on appeal.

Defendant next claims that he was denied his constitutional right to effective assistance of counsel. Specifically, defendant asserts that he was inadequately represented at trial by counsel on the following grounds: The public defender failed to present all the available evidence on the insanity defense; he failed to argue facts which would support a finding that defendant was more properly charged with involuntary manslaughter in the killing of Sergeant White (facts relating the number of shots fired, location of the officers and which shots could have struck White); the defense counsel did not present the jury instruction defining "recklessly" and did not tender the correct insanity jury verdict form; he failed to file a motion for a new trial which properly preserved the issue for review; and the public defender did not attack the validity of the Illinois death penalty statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1) at the trial.

In order to establish incompetency of appointed counsel, the defendant is required to establish actual incompetence of counsel, as reflected by the manner of

carrying out his duties as a trial attorney which results in substantial prejudice without which the outcome would probably have been different. (*People v. Georger* (1972), 52 Ill. 2d 403, 409; *People v. Dudley* (1970), 46 Ill. 2d 305, 308.) We find that defendant has not satisfied this test. First, defense counsel fulfilled his duty of raising the issue of defendant's sanity by putting Dr. Leo Goldman on the stand. The fact that he did not put additional lay or expert witnesses on the stand does not amount to incompetency. Nor can we say that the jury would not have found the defendant sane had more witnesses been presented. Counsel's failure to present a detailed argument concerning the physical evidence did not amount to incompetence; such an argument would have been purely speculative. We have already discussed counsel's failure to present the jury instruction defining "recklessly" and the proper insanity verdict form, and we determined, in our prior analysis, that neither omission resulted in substantial prejudice. Defendant was not substantially prejudiced by the general motion for a new trial filed by the public defender; he is protected from a denial of a fair trial by virtue of our Rule 615(a) (73 Ill. 2d 615(a)), which permits the court to consider plain error affecting substantial rights even where not brought to the attention of the trial court. Finally, counsel's failure to argue the validity of the death sentence did not operate to substantially prejudice the defendant; for reasons expressed later in this opinion, we rule that the death penalty will not be imposed in this case.

Defendant also claims that he was denied a fair trial because the jury was chosen from a venire which excluded persons who said they could not, under any circumstances, vote to impose the death penalty. Such a venire, according to the defendant, was biased not only on the issue of sentencing, but also in favor of conviction.

Defendant concedes that this argument has been

rejected by the Supreme Court (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770) and by our court (*People v. Wright* (1974), 56 Ill. 2d 523; *People v. Madison* (1974), 56 Ill. 2d 476; *People v. Brooks* (1972), 51 Ill. 2d 156; *People v. Clark* (1972), 52 Ill. 2d 374). However, according to the defendant, an examination of three articles published subsequent to the *Witherspoon* decision containing additional research leads to a finding that such juries are "conviction-prone." (Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen,* 42 U. Colo. L. Rev. 1 (1970); Jurow, *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process,* 84 Harv. L. Rev. 567 (1971); Boehm, *Mr. Prejudice, Miss Sympathy, and the Authoritarian Personality: An Application of Psychological Measuring Techniques to the Problem of Jury Bias,* 1968 Wis. L. Rev. 734.) In its brief, the State assails the validity of the studies, asserting that they are dated and statistically inaccurate.

We do not here decide the validity of the studies. In the case before us, defendant does not dispute that he killed Rosemary, set fire to her house and caused the death of Sergeant Harry White. The only two issues for the jury to determine therefore were whether he was insane at the time he committed the arson and the murder of Rosemary and whether he would have been more properly charged with involuntary manslaughter for the death of Sergeant White. The articles cited by the defendant support his assertion that such a jury would be more prone to find a defendant guilty. Here, there is overwhelming evidence that he committed the homicides and set fire to the house. Defendant cites no authority for the proposition that a "conviction-prone" jury would be more likely to find a defendant sane or chargeable with a greater offense. We therefore decline to hold that a jury

without scruples concerning capital punishment is biased in favor of a finding of sanity and a more severe charge.

Defendant raises many issues regarding the constitutionality of the death penalty statute both on its face and as applied. Since we find the death penalty to be inappropriate in this case, we need not address these arguments. For similar reasons, we also need not consider whether defendant's waiver of a jury for sentencing was valid. We, however, uphold the sentences imposed for arson and the murder of Rosemary against defendant's charge that such sentences are excessive. This court will not disturb a sentence imposed by the trial court unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose. In this State, the spirit and purpose of the law are upheld when a sentence reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant. (*People v. Heflin* (1978), 71 Ill. 2d 525, 545; *People v. Murphy* (1978), 72 Ill. 2d 421, 439.) In considering the murder of Rosemary and the arson, the judge noted that the jury had rejected the defendant's defense of insanity and noted his disbelief in this defense. He pointed out the seriousness of the offense and the evidence which established that these crimes had been planned in advance. The trial judge stated that he was considering the serious nature and the circumstances of these offenses and also the history and the character and condition of this defendant and concluded that lengthy sentences for these two offenses were required. We cannot say that the sentences constitute a great departure from the fundamental law and its spirit and purpose.

Finally, we consider defendant's claim that the trial court erred in its imposition of the death penalty for the murder of Sergeant White. At the sentencing hearing, the court considered factors in aggravation and mitigation.

(Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).) The court found, beyond a reasonable doubt, that the defendant was over 18 years of age at the time of the offense, that Harry White was a peace officer killed in the course of performing his official duties, and that defendant knew or should have known that Harry White was a peace officer. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(1).) In reviewing the evidence presented at the penalty hearing, the court noted that the defendant had no significant history of any prior criminal activity, which the statute states is a mitigating factor the court or jury may consider. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(1).) However, the court stated:

"However, in this court's considered opinion that mitigating factor is diminished greatly, if not totally extinguished, by the fact that a few hours before the murder of Harry White, the defendant had with malice aforethought brutally murdered his wife and committed arson of the house in which her body lay."

It is apparent that because of these other offenses committed just a few hours before the murder of Sergeant White the court gave no consideration to the absence of any prior criminal activity as a mitigating factor. This we consider to be error. These three criminal offenses are all a part of one unfortunate and tragic event precipitated by the events leading up to the killing of Rosemary. It does violence to the intent of the legislature if the first two offenses are permitted to eliminate from consideration the mitigating effect of a prior life free of crime. The court also noted that another statutory mitigating factor may be applicable; that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance not sufficient to constitute a defense to the prosecution. The court discounted the testimony of the psychiatrist on this point, stating that it was based to a great degree on the doctor's belief

that the defendant was attempting to kill himself when he shot Sergeant White. The court stated that the evidence clearly showed that defendant was not attempting to commit suicide. We find that the court here again erred in determining that the defendant was not under extreme mental or emotional disturbances.

In addition to the psychiatrist, defendant's personal physician testified that on September 10, 1975, the defendant had a serious heart attack and that his life hung in the balance. Again, on August 8, 1976, the defendant had a second heart attack. On June 15, 1977, he was again hospitalized for a cerebral concussion and multiple injuries, including a fracture of his wrist. He also underwent a laminectomy of which the doctor was aware but in which procedure he did not participate. The doctor testified that for a year or two prior to November 1977 the defendant had deteriorated physically and emotionally. Approximately a year before the murder the doctor had counseled both Rosemary and the defendant concerning marital difficulties. The doctor stated that the defendant's two heart attacks had left him "partly disabled and really incapable of leading a complete and fulfilling life for a man in his early forties." He stated that the defendant, during this time, was undergoing a slow grieving process related to the loss of the affection of his wife. The doctor had suggested that the defendant seek counseling. This testimony is supportive of the psychiatrist's testimony that the defendant was extremely distraught when he killed Sergeant White. It should be noted that the psychiatrist had accepted the proposition that the defendant intended to commit suicide and not necessarily that he was attempting to commit suicide at the time he killed Sergeant White, which, as noted above, the trial court rejected.

The statute does not limit the consideration of the court or jury to only those mitigating factors set out in

section 9—1(c) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)). There is other evidence in the record, though not presented at the penalty hearing, worthy of consideration in mitigation. After the defendant had killed his wife and burned the house, he obviously was aware that his future was uncertain. He also realized that his son would be left without support. In spite of his own personal troubles at that time, the defendant was concerned about his son. He tried to contact his daughter so he could give her money for his son's support. Since he was unable to reach her, he put $3,200 in an envelope and gave it to his companion at the tavern, who was instructed to give it to his daughter for his son's use.

These mitigating circumstances do not bespeak a man with a malignant heart who must be permanently eliminated from society. The Supreme Court has held that, while individualizing sentencing determinations generally reflects simply enlightened policy, in capital cases the fundamental respect for humanity underlying the eighth amendment "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." (*Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) See also *Roberts v. Louisana* (1976), 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001. See generally, Dix, *Appellate Review of the Decision to Impose Death,* 68 Geo. L.J. 97 (1979).

Focusing on the individual offender and the circumstances of the particular offense (and not on the fact that it was a peace officer who was killed), we see an individual with no past criminal record who would in all probability be leading a life acceptable to our society had not his unfortunate marital affair triggered this tragic sequence of events. We hold that the penalty of death should not be imposed upon the defendant.

True, as argued by the prosecutor at the sentencing hearing, this case involves the death of a peace officer. The legislature, by the statute, for obvious reasons, has specified the killing of a peace officer as an aggravating factor. Regardless of who may be the victim, the eighth amendment, as noted in *Woodson v. North Carolina,* requires that consideration be given to the character and record of the individual offender and to the circumstances of the particular offense.

The convictions and sentences of the defendant for the murder of Rosemary Carlson and for the arson are affirmed. The conviction of the defendant for the murder of Harry White is affirmed. The penalty of death for that conviction is set aside and the cause is remanded to the circuit court of Lake County with directions to impose a sentence on the defendant other than death.

> *Judgments affirmed; death sentence*
> *vacated; cause remanded,*
> *with directions.*

MR. JUSTICE UNDERWOOD, concurring in part and dissenting in part:

I concur in the affirmance of the conviction. I dissent from the reversal of the death sentence.

The majority reverses because "the [trial] court gave no consideration to the absence of any prior criminal activity as a mitigating factor" and erred "in determining that the defendant was not under extreme mental or emotional disturbances." (79 Ill. 2d at 588-89.) It is, however, entirely clear in this record that the trial judge considered the absence of a prior criminal record, but believed its mitigating effect outweighed by the fact that, as the judge put it, defendant had "brutally murdered his wife and committed arson of the house in which her body lay." It is not factually correct, and it is unfair to the trial judge to state, that he gave "no consideration" to the absence of

a prior criminal record.

My colleagues apparently are also influenced by the fact that they view these murders and arson as "all a part of one unfortunate and tragic event" (79 Ill. 2d at 588) and seem impressed by defendant's concern for his son. They say the circumstances here "do not bespeak a man with a malignant heart who must be permanently eliminated from society." (79 Ill. 2d at 590.) I would have thought that all murders were "unfortunate and tragic," but I would not view that fact as any justification for vitiating all death penalties. Nor do I find any great amount of parental concern being manifested by a father who has just murdered his son's mother and intends to flee to California.

Any suggestion that defendant was attempting suicide when he killed Sergeant White is, in my judgment, little short of ridiculous. As my colleagues acknowledge, defendant knew the officers were police when they entered the bar, and he drew his gun as they approached. Defendant killed Sergeant White by firing two shots into his chest at point blank range, and fired three or four more shots during the ensuing struggle. His conduct clearly negates any claim of attempted suicide or anything other than the intentional killing of a known police officer.

Death penalty cases are not pleasant. The General Assembly, however, in response to overwhelming public demand (S. Gove & T. Kitsos, Revision Success: The Sixth Illinois Constitutional Convention 135 (National Municipal League, State Constitutional Convention Studies, No. 8, 1974)) has repeatedly enacted death penalty statutes. We have upheld the constitutionality of the current one (People ex rel. Carey v. Cousins (1979), 77 Ill. 2d 531, People v. Brownell (1980), 79 Ill. 2d 508), and we ought to permit its implementation, absent reversible error. There is, in my judgment, no such error here. I would affirm the death sentence.

MR. JUSTICE CLARK, dissenting:

It is my firm belief that the majority opinion is incorrect on several points. Paradoxically, the majority glosses over the numerous errors committed at trial, while setting aside findings made during the sentencing hearing which were strongly supported by properly admitted evidence. In my view, the errors committed during trial require reversal. Had the convictions been proper, however, as the majority decides, it is inappropriate to usurp the trial court's sentencing function and substitute the majority's weighing process for the trial court's.

The first issue about which I disagree with the majority opinion relates to the evidence and argument concerning the missing diamond ring. The defendant has argued that the prosecutor's comments that the defendant took the ring unfairly prejudiced the defendant. I agree.

Officer Delwin Hanson of the Waukegan Police Department testified at trial that he searched the house on November 14, 1977, the day after the offenses involved here, to look for evidence. He testified that after he thoroughly searched the house, he left, while James Hyde, the decedent's son by a prior marriage, stayed behind. Officer Hanson did not testify that he observed the purse (which the defendant's son Eric testified contained the ring) on November 14, 1977. Officer Hanson did say that, when he left, Hyde was searching through a dresser in the bedroom *looking for items of value* which he intended to take for himself and other members of the family. The purse was in that same bedroom. The officer further testified that he did not enter the house again for 4½ months, but that he did drive past it occasionally, and he observed that the windows, but not the doors, were boarded up. When Officer Hanson did reenter the house, it was on April 3, 1978. At that time, he discovered the decedent's purse in the bedroom amidst the soot and ashes of the partially burned house. He testified that the

purse was on the floor, that it had been opened and turned over, and that some of its contents were scattered on the floor. The officer said that he looked for the diamond engagement ring specifically but that he was unable to find it. In closing argument, the prosecutor theorized that the defendant returned to the house after shooting Rosemary so that he could take the ring and set fire to the house. Specifically, the prosecutor stated that the defendant drove to a vacant lot a short distance from the house to calm down. The prosecutor continued:

> "He sits there and he thinks about what's going on here. I've got to calm myself down. He says, 'Okay. I've completed one part of my plan. I simply have to go back and burn down the house. Besides that, she has that ring that I didn't get. She has the diamond ring.'
>
> And you will recall the defendant is a little concerned about rings on Sunday because he told me, when I asked him whether or not he insisted that she put on her emerald ring that he had given her that morning, 'Yes, she did.' Indeed, he insisted that she put on that ring. The ring was bothering him.
>
> * * *
>
> He gets the ring, sets the fire, and leaves, very nice and calm, and saying hello to the children."

It is clear the prosecutor was attempting to demonstrate that the defendant's acts were deliberate, calculated and rational. In short, despite the majority's protestations to the contrary (79 Ill. 2d at 578), Officer Hanson's testimony and the prosecutor's comments were explicitly designed by the prosecution to negate the defense of insanity.

Assumptions and statements of fact not based upon evidence in the case may not be properly argued to the jury and, under circumstances such as the present, are prejudicial to the accused. (*People v. Beier* (1963), 29 Ill. 2d 511, 517.) In *Beier* the prosecutor argued that because no fingerprints were found on the gun which had been used to murder the defendant's husband, the defend-

ant wife must have wiped them off. It was concluded by this court that the comments by the prosecutor deprived the defendant of a fair trial and the cause was remanded to the circuit court for a new trial.

*People v. Newbury* (1972), 53 Ill. 2d 228, also involved a murder conviction. The defendant caused the death by asphyxiation of the decedent, to whom he was engaged to be married. As in the instant case, the defendant did not deny committing the act; he maintained that he was insane at the time of its commission. Error was assigned on several grounds, including the admission of a torn photograph of the defendant found in the decedent's apartment, which the State argued tended to show that the decedent and the defendant had quarreled. It was held that the photograph should have been excluded because its relevance depended upon unproved assumptions that the decedent had torn it and that she had torn it deliberately and recently. (*People v. Newbury* (1972), 53 Ill. 2d 228, 240.) It is noteworthy herein that the decedent's 'son, James Hyde, was not called as a witness by either party to ascertain whether he might have taken the ring. Moreover, the defendant was never asked whether he took the ring, nor was the ring found in his possession, actual or constructive, when he was arrested. There was therefore no basis in the evidence to support the assumption that the defendant took the ring, yet the prosecution insistently argued that the defendant had taken it.

It is impossible to determine the exact effect that improper evidence has upon the minds of the jurors. Every defendant, be he a sinner or a saint, has the right to expect that his fate will be decided with reference only to the circumstances of the crime with which he is charged. (See *People v. Donaldson* (1956), 8 Ill. 2d 510, 519.) While it is true, as the majority states, that no objection was raised to the prosecutor's comments concerning the ring, it has repeatedly been held that failure to

object to improper argument will not constitute a waiver when a prosecutor's argument is so seriously prejudicial that it prevents the defendant from receiving a fair trial. (*People v. Sullivan* (1978), 72 Ill. 2d 36, 42; *People v. Romero* (1967), 36 Ill. 2d 315, 320; *People v. Morgan* (1960), 20 Ill. 2d 437, 441; *People v. Fort* (1958), 14 Ill. 2d 491, 500-01; *People v. Moore* (1956), 9 Ill. 2d 224, 231-32.) In *People v. Sullivan* we held that the prosecutor's disclosures of the defendant's alleged accomplices' guilty pleas in opening statement and during the trial, and the prosecutor's reliance upon the pleas during closing argument to urge the jury to find the defendant guilty, was a single continuous error which deprived the defendant of a fair and impartial trial. The fact no objection was made to the prosecutor's disclosures did not prevent our taking notice of the error. I think the same result should have been reached here because the contrived interpretation of Officer Hanson's testimony made by the prosecutor in closing argument seriously prejudiced the defendant and deprived him of a fair trial.

A second objection I have with the majority opinion is its treatment of Eric Carlson's testimony. The defendant has asserted on appeal that the State committed prejudicial error on direct examination when it asked the defendant's son Eric questions concerning an argument between the defendant and Rosemary. The following exchange took place:

"Q. [The Prosecution] Do you recall the conversation between your father and your mother where he told her or told you that he had bought two gas cans and had them filled up with gasoline the day before?

A. [Eric] No.

Q. Did he tell your mother that he had bought a gun on Friday before that Sunday?

A. No.

Q. Did he tell her that it was right in the car?

A. No."

As may be seen, Eric's testimony was that no argument ever took place. After the foregoing colloquy, the court indicated that an objection might be made by defense counsel. The court then asked the prosecutor outside the hearing of the jury whether the State intended to show that any such argument did occur. The prosecutor said no. There is no mention in the record that the court sustained an objection; however, the court did state that the questions were improper, because Eric was the State's witness and the prosecution should know how he would answer the questions. I think the prosecutor's questions, designed to create the impression that the defendant had deliberately planned the murder of Rosemary and the arson, constitute reversible error. The implication is apparent that the State was attempting to show that the defendant had threatened Rosemary, when the testimony of the defendant's son is that no such conversation took place.

In *People v. Burbank* (1972), 53 Ill. 2d 261, 269-71, this court held that where defense counsel asks a police officer on cross-examination whether the officer made threats to the defendant, and the officer denies having done so, some proof had to be offered to show that the threats were made. Otherwise, the interrogation merely creates an innuendo unsupported by evidence. (*People v. Burbank* (1972), 53 Ill. 2d 261, 271.) This manner of interrogation whereby counsel makes insinuations not supported by proof is improper whether done by the prosecution, as here (see *People v. Nuccio* (1969), 43 Ill. 2d 375), or by defense counsel, as in *Burbank*.

I cannot in any way agree with the majority's assertion that the prosecution's comments concerning the missing diamond ring, and the prosecutor's direct examination of Eric which implied threats and deliberation on the part of the defendant, are unrelated to the defense of insanity. On the contrary, the clear thrust of the prosecutor's

conduct in both instances was to show that the defendant was acting deliberately and therefore sanely when he took the life of his former wife and set fire to the house. We have recently expressed our awareness of the growing concern over improper prosecutorial arguments (*People v. Baptist* (1979), 76 Ill. 2d 19, 28), yet the majority is willing to characterize the seriously prejudicial and improper argument and questions in this case as harmless. The errors at trial were not harmless; they were a distortion of the defendant's defense of insanity and therefore could have influenced the outcome in this case. (*People v. Manzella* (1973), 56 Ill. 2d 187, 200; *People v. Murphy* (1916), 276 Ill. 304, 324.) The fact that the prosecution impliedly referred to imaginary threats and actually misstated the evidence concerning the missing diamond ring could easily have affected the jury's determination of whether the defendant was acting deliberately and sanely or not at the time of Rosemary's killing and the arson. Also, it is very plausible that if the jury believed that the defendant had stolen the ring and had plotted the deliberate murder of his former wife and the arson of her house, he was also capable of deliberately lying at trial concerning whether he had attempted suicide or had acted intentionally when he killed Sergeant White. Thus, the prosecutor's attempt to overcome the defendant's defense of insanity by improperly making unfounded assertions should not be permitted, because it deprived the defendant of a fair trial. (*People v. Weathers* (1975), 62 Ill. 2d 114, 120-21.) Moreover, the majority's refusal even to consider these errors and its affirmance of the convictions not only condones the prosecution's improper conduct, it invites further prosecutorial overreaching.

The majority's second reason for not noticing the error—that defense counsel should not "gain the advantage of obtaining a reversal through his own failure to act, either intentionally or inadvertently"—is hardly persuasive.

(79 Ill. 2d at 577.) We are not here concerned with defense counsel's win-loss record, we are concerned that the defendant receive a fair trial and that the integrity of the judicial process not be deteriorated. (See *People v. Romero* (1967), 36 Ill. 2d 315, 320.) The effect of the majority's reasoning is to acknowledge that the defendant was denied a fair trial but to refuse to remedy the situation because counsel was less than effective in his representation. To do so punishes the defendant for counsel's misfeasance.

I am compelled to observe at this point that this case is precisely the type of case where Rule 615(a) (73 Ill. 2d R. 615(a)) should be invoked to notice the plain errors which occurred at trial. This is particularly true in this case because it reached this court on direct appeal due to the imposition of the death sentence, and this court has consistently held that a higher standard of review is applicable in capital cases. While normally in criminal cases this court will affirm a conviction if no *substantially* prejudicial error occurs, *(People v. Nilsson* (1970), 44 Ill. 2d 244, 248, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881; *People v. Stahl* (1962), 26 Ill. 2d 403, 406), where the extreme penalty for murder is fixed, even if proof of guilt is clear, there must be no *prejudicial error* committed during the trial if the reviewing court is to be justified in affirming the judgment *(People v. Myers* (1966), 35 Ill. 2d 311, 335; *People v. Bernette* (1964), 30 Ill. 2d 359, 368; *People v. Oden* (1960), 20 Ill. 2d 470, 485; *People v. Dukes* (1957), 12 Ill. 2d 334, 339; *People v. Donaldson* (1956), 8 Ill. 2d 510, 519; *People v. Winchester* (1933), 352 Ill. 237, 248; *People v. Arthur* (1924), 314 Ill. 296, 315). While several cases hold that the judgment must be reversed because the jury not only determined the question of guilt, but also fixed the punishment (see, *e.g., People v. Oden* (1960), 20 Ill. 2d 470), I think the same result should prevail when, as here, the jury determined guilt

and the court fixed the penalty. The reason for reversal for a new trial is the same in either instance: it is impossible to determine the exact effect that improper evidence has upon the minds of the jurors. (*People v. Donaldson* (1956), 8 Ill. 2d 510, 519.) *People v. Dukes* (1957), 12 Ill. 2d 334, is quite analogous to the instant case. There the State introduced evidence that the murder victim lived with his wife and four children. In closing argument, the prosecution, on more than one occasion extolled the virtues of the deceased. After stating that admission of evidence that the deceased left a spouse and family is condemned and that a "prosecutor should never inject into his argument evidence not introduced at the trial" (12 Ill. 2d 334, 341), the court concluded it was compelled to reverse the judgment and order a new trial due to the admission of incompetent evidence and the inflammatory and prejudicial argument of the prosecutor. Furthermore, the court made the following telling statement:

"From the evidence in this case, we conclude that the jury was justified in returning a verdict of guilty and that the death penalty may well have been warranted. But our review cannot end with that observation. We must determine whether prejudicial errors were committed during the trial which deprived the defendant of those constitutional safeguards which, under our laws, are afforded to the guilty as well as the innocent. Where the charge is murder, a jury has wide discretion in fixing the punishment. (Ill. Rev. Stat. 1955, chap. 38, pars. 360 and 801.) And when, in the exercise of that discretion it inflicts the death penalty, this court cannot affirm that judgment even though proof of guilt is clear, if prejudicial error occurred in the trial. *People v. Crump,* 5 Ill. 2d 251; *People v. Jackymiak,* 381 Ill. 528; *People v.*

*Winchester,* 352 Ill. 237; *People v. King,* 276 Ill. 138." *People v. Dukes* (1957), 12 Ill. 2d 334, 339-40.

I emphasize that the standard that prejudicial error requires reversal should have been applied in the instant case even though the majority has vacated the death sentence. That is because, if the majority had applied the appropriate standard to the errors which occurred at trial, it would reverse for a new trial, without ever reaching the issue of the propriety of the sentence of death. Thus, I think the court should have invoked Rule 615(a) to notice the plain errors and, since the errors were prejudicial, should have reversed the trial court and ordered a new trial.

I must also take issue with the majority's resolution of the question of ineffective assistance of counsel. Specifically, the majority states that the defendant was not prejudiced by the very general motion for a new trial filed by the public defender. The motion requested a new trial based on the following grounds:

"1. The Defendant was not proven guilty beyond a reasonable doubt.

2. The Defendant did not receive a fair trial.

3. The Defendant was denied due process of law.

4. The Defendant was denied equal protection of the laws."

Suffice it to say that the motion should have been more specific in identifying the various errors which occurred at trial. Additionally, in my opinion, defense counsel's entire representation was uneven and could have been considerably more vigorous in objecting to the prosecution's unfounded theories and assumptions. It is primarily because counsel did not object throughout the trial that this court has concluded the various trial errors have been waived. (79 Ill. 2d at 575-78.) Thus, if counsel had objected, thereby bringing the seriously prejudicial errors to

the attention of the trial court, as well as preserving the questions for review, the outcome of this case might well be different.

Moreover, I must point out that the majority, in deciding that the defendant was afforded the effective assistance of counsel, makes the following statement:

"Defendant was not substantially prejudiced by the general motion for a new trial filed by the public defender; he is protected from a denial of a fair trial by virtue of our Rule 615(a) (73 Ill. 2d 615(a)), which permits the court to consider plain error affecting substantial rights even where not brought to the attention of the trial court." (79 Ill. 2d at 585.)

It is a mystery to me how the majority can seriously assert that the defendant was not denied the effective assistance of counsel because of the protection afforded by Rule 615(a). Shortly before, the majority had concluded that Rule 615(a) did not apply to this case. How, I wonder, may the majority contend in one breath that Rule 615(a) should not be used to notice plain error in this case while in the next breath attempt to set up the rule as the reason the defendant received a fair trial? Such an argument makes clear that, for this defendant, a fair trial is more of an illusion than a reality.

My final cause for disagreement with the majority opinion concerns the majority's decision to vacate the death sentence. This court has repeatedly held that it will not disturb a sentence imposed by the trial court unless there has been an abuse of discretion. (*People v. Lykins* (1979), 77 Ill. 2d 35, 40; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153; *People v. Bonner* (1967), 37 Ill. 2d 553, 563.) In *People v. Lykins* the defendant was convicted of conspiracy, armed robbery and murder. The trial court imposed a sentence of 70 to 150 years. We said there:

"Though Supreme Court Rule 615(b)(4) (58 Ill. 2d R. 615(b)(4)) allows the reduction of sentences by a reviewing court, 'It is not our function to serve as a sentencing court, and we will not substitute our judgment for that of the trial court merely because we might have imposed a different sentence had that function been delegated to us.' (*People v. Waud* (1977), 69 Ill. 2d 588, 596.) ***.

***. The trial judge is authorized to consider not only the defendant's character but also the 'nature and circumstances of the offense' in imposing a sentence. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—8—1(c)(1).) Admittedly, the sentence is severe; however, it is justified by the brutal nature of the crime." (*People v. Lykins* (1979), 77 Ill. 2d 35, 40.)

Thus, where the trial court has scrupulously attempted to comply with the guidelines laid down in the statute for imposing the death penalty, I think it is inappropriate to disregard the lower court's carefully considered and well-supported decision. Yet that is precisely what the majority has done, with virtually no justification whatever for doing so.

The majority opinion states: "It is apparent that because of these other offenses [the murder of Rosemary and the arson] committed just a few hours before the murder of Sergeant White the court gave no consideration to the absence of any prior criminal activity as a mitigating factor. This we consider to be error." (79 Ill. 2d at 588.) The majority's statement is incorrect. The trial court did specifically find that the defendant had no prior criminal history and did expressly consider that factor. The trial court stated:

"With reference to mitigating factors, number one, which is that the defendant had no prior criminal activities, this Court has already stated that the defendant had no

significant history of any prior criminal activity."

The trial court went on to say, as quoted by the majority, that that mitigating factor was "diminished greatly, if not totally extinguished, by the fact that a few hours before the murder of Harry White, the defendant had with malice aforethought brutally murdered his wife and committed arson of the house in which her body lay." Hence I am unable to discern the majority's reason for concluding that the trial court did not consider the absence of a prior criminal history as a mitigating factor. It is clear that the trial court was properly engaged in the weighing process required by the United States Supreme Court in *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909, and its progeny. Therefore the majority was without justification in disturbing the trial court's findings.

The majority continues: "It does violence to the intent of the legislature if the first two offenses [the murder of Rosemary and the arson] are permitted to eliminate from consideration the mitigating effect of a prior life free of crime." (79 Ill. 2d at 588.) The majority does not offer any reason for this conclusion, and I am at a serious loss to see one. In my opinion, the trial court balanced the defendant's lack of a criminal history against the brutal murder of his former wife and the arson of her house. The trial court is permitted to conduct such a process under the express legislative authority of section 9–1(c) (Ill. Rev. Stat. 1977, ch. 38, par. 9–1(c)), which provides that aggravating factors may include nonstatutory as well as statutory factors. Thus, the court was well within the purview of the murder statute when it weighed the defendant's lack of a criminal history with the nonstatutory aggravating factor that he had committed two other offenses the same day he killed Sergeant White. No violence was done to the intent of the legislature by the trial court.

Furthermore, the majority has mistakenly substituted

its judgment as to the existence of a second mitigating factor for the amply supported finding by the trial court that it did not exist. The majority states: "We find that the court here again erred in determining that the defendant was not under extreme mental or emotional disturbances." (79 Ill. 2d at 589.) I do not think the evidence supports the majority's conclusion that the trial court was in error. It is true, as the majority points out, that the defendant was undergoing a gradual physical and emotional deterioration for some years prior to November 13, 1977. It is also true that a psychiatrist, Dr. Goldman, testified at the sentencing hearing that he believed the defendant to be under the influence of an extreme mental or emotional disturbance on November 13, 1977. While there was evidence to support both sides, I think the statement in the recent case of *People v. Brownell* (1980), 79 Ill. 2d 508, 540, on this precise point is of some guidance:

> [W]e should not lightly overturn the findings of the trial court, particularly when they are amply supported by the record. (See, *e.g., People v. Myers* (1966), 35 Ill. 2d 311, 340-41.) Therefore the finding of the trial court that the defendant did not commit murder while under the influence of an extreme mental or emotional disturbance will be sustained."

I think the majority places undue emphasis on the gradual deterioration of the defendant's physical and emotional condition. That the defendant had serious problems is beyond dispute; but that these problems were sufficient to be "extreme" and thus serve to obviate the fact that the defendant shot and killed a peace officer in the course of his duties is a dubious contention. Moreover, the notion that the defendant might have been contemplating committing suicide some time in the future, in part because he had killed Rosemary and set fire to the house, does not meet the statutory requirement that the defendant

be acting under the influence of an extreme mental or emotional disturbance when the murder was committed. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(2).) Thus the trial court was correct in discounting this factor since the jury determined at trial that the defendant was not attempting to commit suicide when he shot Sergeant White three times, causing his death. The majority is again incorrect in replacing its findings for the well-supported and considered findings of the trial court.

Furthermore, I find it incongruous that the majority can refuse to consider errors at trial which unfairly confound the defendant's defense of insanity, yet, with little evidence to support it, draw the conclusion that the defendant was, when he killed Sergeant White, "under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution [such as, insanity]" (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(2).) In other words the majority has found the defendant was acting under an extreme mental disturbance when he killed Sergeant White, yet the majority refuses to consider errors which reflect on whether he may have been under a more severe disturbance only a few hours before. I would think our first order of business would be to ensure the defendant a fair trial before we invade the province of the trial court as to sentencing.

Finally, the majority considers several nonstatutory mitigating factors which it concludes prove that the defendant does not have a "malignant heart." (79 Ill. 2d at 590.) Again, the majority has exceeded the bounds of appellate review authorized under the statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i)) and interpreted by *People v. Brownell* (1980), 79 Ill. 2d 508, and is unnecessarily substituting its judgment for the trial court's. The majority is certainly correct to state that the particularized circumstances of this defendant and this offense are to be considered in imposing sentence. (*Gregg v.*

*Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909; *Proffitt v. Florida* (1976), 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960; *Jurek v. Texas* (1976), 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950; *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978.) Still, I do not think the majority is justified in concluding that because the defendant is not a person with a "malignant heart," the trial court erred in imposing the death penalty. First of all, I do not know from what source the majority has obtained the perspective that the defendant lacks a malignant heart. Secondly, even if it were true, I do not see its relevance. Thirdly, when the majority's intangible and vague standard of a malignant heart is weighed against the statutory aggravating factor, proved beyond a reasonable doubt, that the defendant killed a peace officer while the officer was in the performance of his official duties, the arbitrariness of the majority's standard becomes readily apparent.

In sum, I would reverse the trial court on account of the multiple and seriously prejudicial errors which occurred at trial. If however, as the majority decides, the trial was error free or the errors did not rise to the level of plain error (see 73 Ill. 2d R. 615(a)), then I think the trial court's sentence should stand, because it was amply supported by the evidence adduced at the sentencing hearing. I do not think the trial court's findings should be arbitrarily swept aside and replaced by the majority's findings, absent a showing of an abuse of discretion, which the majority has not found.

MR. JUSTICE MORAN joins in this dissent.